Opinion by
 

 Keller, P. J.,
 

 This is an appeal by Violet S. Happer from a decree of the Orphans’ Court of Allegheny County entered September 12, 1940, dismissing her exceptions to the decree of said court entered June 19, 1940, which in turn dismissed her petition for citation
 
 [1]
 
 on appeal from
 
 *81
 
 tlie probate of the will of her deceased aunt, Annie E. Morgan, and sustained said probate and the grant of letters testamentary thereon to John T. Swick, the appellee.
 

 We are of opinion that on the testimony of John T. Swick himself and of the witnesses called by him, when considered with the testimony as to the decedent’s mental condition, the appeal should have been sustained and the probate of the will revoked and the letters testamentary issued thereon set aside.
 

 The decedent, Annie E. Morgan, was a childless widow, eighty-five years old at the date of the execution of the alleged will on March 8, 1939. Since October 1927 she had been an inmate of the Allegheny County Hospital for Mental Diseases at Woodville. Prior to that she had been a guest or inmate of the G.A.R. Home at Hawkins Station, her deceased husband, Thomas Jefferson Morgan, having been a Union soldier in the Civil War, and as his widow she was in receipt of a pension from the United States government. On February 1, 1928 she was duly adjudged a weak-minded person unable to take care of her property and liable to dissipate and lose the same and become the victim of designing persons, and the Potter Title & Trust Company was appointed her guardian and remained such until her death. Her estate, at her death, consisted entirely of the surplus accumulations of her pension money remaining in the guardian’s hands after paying the expenses of her maintenance in the hospital.
 

 It was testified that prior to said adjudication and the appointment of her guardian she had refused to endorse her pension checks, in consequence of which the pension was stopped, but was subsequently restored through the instrumentality — at least in part — of this appellant.
 

 The appellee, John T. Swick, who is also the execu
 
 *82
 
 tor of the will
 
 [2]
 
 and sole legatee under it of the estate remaining after payment of her funeral expenses and the erection of a monument on the family lot, was a young man twenty-two years old, not a blood relation of hers, but a grand-nephew of her deceased husband, the grandson of his sister, G-race Morgan Butler. As a boy twelve or thirteen years old he had gone with his mother, Sarah Butler Swick, and his aunt, Mrs. Amy Stuart, to see Mrs. Morgan at Woodville, and had called there five or six times with them during the intervening eight or ten years.
 

 On August 2, 1937, when he was twenty years old, he had of his own motion written the superintendent of the hospital asking as to Mrs. Morgan’s physical and mental condition, and her ability to make a will. The superintendent had replied as follows:
 

 
 *83
 
 “Allegheny County Home Woodville, Pa.
 

 Bingham Boyce, M.D. Superintendent
 

 Hospital for Mental Diseases Tuberculosis Sanatorium Private Exchange Carnegie 2000
 

 August 10, 1937
 

 Mr. John T. Swick 2331 Arlington Ave. Pittsburgh, Penna.
 

 Be: Annie E. Morgan
 

 Dear Sir:
 

 We have your letter of August 2 in which you inquire about the physical and mental condition of the above named woman who was regularly committed to the Mental Department of this Institution on the Certificate of two Examining Physicians on October 14, 1927.
 

 The diagnosis of this woman is Senile Psychosis. This means that her judgment is poor, her memory is impaired, and she is not able to name people, still thinks she is at the G-.A.B. Home. Because of her inability to reason and understand the circumstances, we look upon her as being incompetent.
 

 Because of this it would not be sensible to permit her to make a will.
 

 Her general physical condition is very poor and she has failed considerably. Because of her advanced age together with her poor physical health, we cannot expect her to live much longer. She is, however, able with assistance to be out of bed much of the day. We do not know your interest or relationship in this case. When I mentioned your name to the patient she asked if that was Sarah Butler’s boy and she implied that she is an aunt of this woman.
 

 
 *84
 
 We understand that the Guardian has taken care of the maintenance for this woman here since her admission.
 

 We would be glad to have you visit the patient and talk further to the Dr. in charge of the case if you so wish.
 

 Your truly,
 

 Bingham Boyce, M.D.
 

 Superintendent.”
 

 The term ‘senile psychosis’ used in the letter, it was testified, is the same as ‘senile dementia.’
 

 There is no testimony in the record that Swick went to see Mrs. Morgan at Woodville between the date of that letter and the date of the will, March 8, 1939. There is no evidence that Mrs. Morgan knew that she had any estate in the hands of her guardian, or that she was being supported out of the pension paid her guardian by the United States, or that she knew that there were accumulations of that pension money held for her by her guardian. It is unquestioned that she was greatly concerned about her burial. She wanted to be buried beside her husband in a cemetery at Portersville, Butler County. That was the constant burden of her conversation. When she entered the G.A.R. Home at Hawkins Station, she left $300 with the officials of the home for that purpose, with directions that she was to be buried at Portersville. The fund was still available at her death but it was not used. It is revealing of her mental weakness that, although her burial was the thought uppermost in her mind, she had forgotten all about this fund which she had set aside for that purpose. There was also available a burial fund of $75, payable by the County Commissioners, in case the total burial expense did not exceed $400, (Act of May 2, 1929, P. L. 1278, Art. Y, sec. 423, 16 PS §423), which was not applied for or obtained The appellee paid for her burial at Portersville out of the
 
 *85
 
 estate, which was inventoried and appraised at about $1500.
 

 The decedent never instructed or requested Swick or
 
 anybody
 
 else to write her will. He was
 
 not a lawyer.
 
 When be bad last seen her lie was not of age. She bad told her husband’s nieces that she wanted to be buried at Portersville beside her husband, and, apparently on
 
 their
 
 instructions, Swick, who was a bartender or clerk in his brother’s restaurant, wrote the will, without any request or instructions from her to do so, and after providing for what was uppermost in her mind — if not the sole thought of which in her weakened mentality she was capable — viz:. her burial, he directed that anything left over should go to himself — that disposition, it being testified, having been agreed upon “by them,” his mother and aunt, the nieces of decedent’s husband.
 

 Having written the will he took it in company with his aunt, Mrs. Amy Stuart, and two neighbors, Mrs. McNamara and Mrs. Eckert, and having obtained admission to Mrs. Morgan’s ward surreptitiously, or at least without complying with the rules — for there is no record of their appearance at or admission to, the hospital on March 8, 1939, as provided for by the rules — and in the absence of the nurse or nurses in charge, who likewise have no record of his, or their presence there that day, he read the will thus prepared by him to Mrs. Morgan in the presence of the witnesses, and on her saying that was what she wanted,
 
 he
 
 — not Mrs. Morgan —directed Mrs. McNamara to write Mrs. Morgan’s name and make her mark
 
 [3]
 
 while Mrs. Morgan’s hand was on the pen holder, and two of the witnesses then signed their names, and they all went away with the will — Mr. Swick’s will, not Mrs. Morgan’s.
 

 The physicians in charge of Mrs. Morgan at the mental hospital, who had specialized in mental cases,
 
 *86
 
 Dr. Michael Commarata and Dr. J. H. Rankin, both testified that she had the nsnal or typical signs of a senile pyschosis, or senile dementia. Dr. Commarata saw her every day, except when he was off duty, that is, he saw her an average of six times a week from January 1939 until her death on September 21, 1939, and he testified that in all that time she was never of sound mind and memory so as to be able to handle her property or dispose of it, to conduct her business affairs or attend to the management or disposition of her property or mentally capable or competent to make a will— that she had not the mentality to understand the implications of any business transaction.
 

 Dr. Rankin saw Mrs. Morgan about once a week from May 1937 until her death. He testified that she showed the usual signs of senile psychosis or senile dementia, plus arteriosclerotic features — predominantly, confusion and memory loss — that on or about and prior to March 8, 1939 she was not a person of sound mind and memory, that she could not competently and safely handle her own affairs, particularly financial affairs, nor was she capable of disposing of her property by will or otherwise; that she could not understand or appreciate or comprehend a transaction involving money.
 

 It was shown by Mrs. Happer, the appellant, that when she came to see Mrs. Morgan, several years before her death, the latter did not recognize or know her, although she had lived with Mrs. Happer for nearly four years from 1907 to 1910, before she entered the G.A.R. Home. She 'and her three brothers were the decedent’s only surviving heirs. One of the appellee’s witnesses testified that Mrs. Morgan would inquire after one of her husband’s relatives, who had been dead for years, and on being told that she was dead, would in the course of a few minutes ask after her again.
 

 As we said before, there is not a word of testimony
 
 *87
 
 in the record that Mrs. Morgan knew that she had an estate of any kind, or of what it consisted, or in whose hands it was; or that she knew her blood relations, or who they were. Her one thought was the desire to be buried beside her husband in the Portersville Cemetery, and any will that provided for that would meet with her approval, irrespective of its other provisions, for she had no knowledge of any estate to be disposed of by her. No one explained to her that she had property in the hands of her guardian of the value of $1500, and if they had, she would not have understood it. She was not capable of doing so or of disposing of it by her will.
 

 A will prepared for a weak-minded woman by one, not of her own blood, without any request, instruction or direction from her to do so, which makes him the sole beneficiary of her estate, cannot be allowed to stand as her will, simply because he includes in it the dominant thought of her weakened mentality, the desire to be buried beside her husband.
 

 It must be remembered that Mrs. Morgan’s estate did not come to her from her husband. It came to her as the generous bounty of the United States, and her husband’s relatives had no moral or equitable claim to it.
 

 The decree is reversed and the record is remitted to the court below with directions to enter a decree in accordance with this opinion.
 

 Costs to be paid by the appellee.
 

 [1]
 

 The proceeding was subsequently joined in by Joseph H. Stewart and Ira L. Stewart, two of the decedent’s nephews— brothers of appellant — making together three out of her four heirs at law.
 

 [2]
 

 The will was as follows:
 

 “March 8, 1939.
 

 “I, Annie E. Morgan, widow of Thomas J. Morgan, of Wood-ville, Pennsylvania, upon my death desire John T. Swick to take charge of my funeral and bury me in the Presbyterian Cemetery at Portersville, Pennsylvania.
 

 “Funeral expenses to cost about four hundred and fifty ($450.00) Dollars. I want a monument placed in the family lot to cost no more than five hundred ($500.00) Dollars. He is to have what is left and to act as executor of this will.
 

 her
 

 Annie E. (X) Morgan mark
 

 “Witnessed by and in the presence of each other.
 

 Katherine McNamara Amy Stuart”
 

 [3]
 

 Mrs. Morgan could write her own name,