Lare Will.

324

■■■■■■■

■■■■■■■

■■■■■■■

■■■■■■■

Argued October 3, 1944; reargued April 11, 1945. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

■■■■■■■

■■■■■ ■■■■■ further reargument refused June 29, 1945.

■■■■■■■

*Bresci R. P. Leonard,* with him *Harry W. McIntosh, Thomas F. Garrahan* and *McIntosh & Garrahan,* for appellant.

*John C. Bane, Jr.,* with him *John J. Heard, Paul J. Winschel,* and *Reed, Smith, Shaw & McClay,* for appellees.

OPINION BY MR. JUSTICE PATTERSON, May 21, 1945:

This is an appeal by Marcellus R. Lare, Jr., husband of Gertrude K. Lare, deceased, and administrator cum testamento annexo of her estate, from the action of the court below sustaining an appeal from the probate of an instrument as her last will and testament, holding that the instrument was a forgery, and refusing appellant's request for the granting of an issue devisavit vel non.

Gertrude K. Lare died June 25, 1942, at her home in Mount Lebanon, survived by her husband, Marcellus R. Lare, Jr., appellant, two brothers, Carl E. Maratta and Paul E. Maratta, and a sister, Katherine Sayre, appellees. Although married twice decedent was childless. In 1932 she was married to George W. Kilpatrick who died July 13, 1935, and in November, 1938, she married appellant. On June 29, 1942, appellant qualified as administrator of her estate. Three days later, while searching for decedent's automobile registration card, he found a writing on the face of a blank check, over decedent's signature, which is purported to be her last will and testament, said writing being as follows:

On July 31, 1942, appellant offered said writing for probate and letters of administration cum testamento annexo were granted. Appeal from said probate was taken by decedent's two brothers and sister to the orphans' court, averring that the alleged will was a forgery and praying that the letters of administration cum testamento annexo be revoked and set aside. An answer was filed averring that the instrument was the will of the decedent. After a hearing appellant petitioned the court to award an issue devisavit vel non for trial of the charge of forgery. The hearing judge held the instrument a forgery and refused to award an issue, stating that "no jury verdict sustaining the will could be permitted to stand." This appeal is from the dismissal of exceptions to the said opinion and decree.

Contestants' evidence established that as a young girl Gertrude K. Lare had become proficient in shorthand and typing. She was employed as stenographer and typist for a number of years and as private secretary to the General Sales Manager of the Crescent Portland Cement Company until 1929. From that date she was never gainfully employed and rarely, if ever, used a typewriter for any purpose although she owned an Underwood portable machine, the one admittedly used in the preparation of the alleged will. All her correspondence was carried on in longhand.

While the wife of George Kilpatrick she contributed generously to the support of her brothers and sister and to their children. This generosity continued until she died. Upon Kilpatrick's death she inherited considerable money which yielded an annual income of approximately $10,000. In 1937, Dr. Pracht, her physician, introduced her to Marcellus R. Lare, Jr., appellant, who was then employed as a security salesman and had been previously employed in a bank. He was a man of little property. A year and a half later they were married in Miami. Appellant left his position in a Miami bank shortly before the marriage, and in April of 1939 they moved to Wilkinsburg, Pennsylvania. In 1940, decedent purchased a $15,000 home in Mount Lebanon, and took title in the name of her husband and herself as tenants by the entireties. Appellees testified that the married life of decedent was unhappy and that she suffered from high blood pressure and upon several occasions was a patient at a hospital and a sanitorium. She was troubled and disturbed by his failure to obtain employment, his continued attempts to interfere with her friendly relationships with her brothers and sister, and his demand for an increased share of her wealth. He left her for two weeks and lived with his mother. He then accepted a position as accountant for the Rust Engineering Company at Portsmouth, Virginia, and retained this position from December, 1940, until April,

1941. During this period decedent visited him twice. Later he returned to Pittsburgh and accepted an appointment to the force of Pennsylvania Bank Examiners which required him to spend much time away from home. J. Kirk Renner, Esq., attended to the small amount of legal work which her property required. He had been attorney for the estate of her first husband.

The check upon which the alleged will was written was identified as coming from the back of her check book. She had been in the habit of removing blank checks, signing and carrying them about in her wallet. The check in question was withdrawn from the back of the book some time between her admission to the West Penn hospital on May 13, 1940, and May 16, 1940.

Immediately upon her decease appellant contacted Renner and inquired whether his wife had left a will and was informed that although she had often mentioned the possibility of making a will providing for her sister and brothers he knew of none. Several days later Renner and Lare had a lengthy discussion at the latter's home about the manner in which the estate would be settled in event of intestacy. After letters of administration had been granted on June 29, 1942, Lare, on July 2, wrote to Renner forwarding numerous papers, among which was the purported will. Renner's advice was to destroy the check. He stated that he would not represent Lare or any other interested party in the settlement of the estate. Numerous attempts were made by appellant to secure Renner as counsel, all of which failed.

Lare sought the advice of appellees' handwriting experts and failed to amply provide his own expert witness with proper samples of deceased's typewriting. At the trial, comparison of Lare's typewriting, made in open court, with that of the reputed will, failed because Lare at that time used an unusually heavy touch. Mr. Nernberg, a handwriting expert, compared the signature on the alleged will with admittedly genuine signa-

tures of the decedent and was of opinion that the former could not have been that of the decedent.

The evidence adduced in support of the validity of the instrument shows that many unimpeachable witnesses agreed that the signature was that of decedent and genuine. Analysis of Mrs. Lare's signatures show them to have similar characteristics with regard to size and variation. Only appellees' witness declared it a forgery. Nernberg failed to take into consideration degrees of variation in writing and made no comparison with exhibits made on or near the date of the alleged signature. Mrs. Lare, around the date of the will, used both dark and green ink. Numerous exhibits were put in evidence in which blue ink was used, to disprove appellees' theory that to be genuine the signature would of necessity have been in green ink. Three people saw Mrs. Lare use the typewriter during the last several years of her life. Although having been ill for a number of years she had not typed professionally for thirteen years. The machine she was using was a small portable machine, not the larger business office type. The typing on the check is neat and the margins well arranged, and not crowded. Comparison of the letters of expert typists, made in the court room, reveal the same errors allegedly existing upon the will. An exhibit typed by one of the professional typists in the court room revealed the same misalignment urged by the appellees as evidence of a forgery. Lare had a habit of completing and punctuating dates; Mrs. Lare wrote partial dates. The contested instrument does not contain any punctuation after the date. Exhibits of actual typing by Mrs. Lare were offered, and Leslie, appellant's expert, used the same for comparison in determining the typing to be that of decedent.

Appellant and decedent had a normally happy life. Any quarrels they had arose over the great amount of gifts of money which were given to the contestants or their children. Her generosity decreased considerably

in the last year of her life. Many exhibits refer to the happy marriage and her great desire to be with him whenever possible. Although contestants were continually attempting to create friction between decedent and appellant, on April 24, 1942, she wrote "I want to live and enjoy life and you and our house." Upon numerous occasions she remarked that she would leave all to her husband, thus establishing the disposition of her estate to be a natural one. Explanation is given for the friction arising between Renner and Lare, that being the existence of a $1000 note to decedent, not marked paid or satisfied. The language of the will and use of a blank check are also explained.

The granting of an issue devisavit vel non is not always a matter of right. Section 21(b) of the Act of 1917, P. L. 363, 20 P.S. 2582, provides: "Whenever a dispute upon a matter of fact arises before any orphans' court, on appeal from any register of wills . . . the said court shall, at the request of either party, direct a precept for an issue to the court of common pleas of the county for the trial thereof . . ." This dispute must be a substantial dispute: *Fleming's Estate,* 265 Pa. 399, 406; *Kane's Estate,* 312 Pa. 531, 534; *Kline's Estate,* 322 Pa. 374, 378. The existence of a substantial dispute can only be determined by consideration of the evidence as a whole. "It is the evidence of the fact on the one hand and the evidence in denial on the other, which raises such a substantial and material dispute . . .": *Hile's Estate,* 310 Pa. 541, 544. An issue should be denied where after careful consideration of all the evidence a verdict in favor of the petitioner would have to be set aside as against the weight of the evidence: *Hile's Estate,* supra, 544; *Fleming's Estate,* supra, 406. An issue should be granted where the evidence is such that a verdict for either party would be permitted to stand: *Hile's Estate,* supra, 544; *Kane's Estate,* supra, 534; *DeLaurentiis's Estate,* 323 Pa. 70, 78; *Kline's Estate,* supra, 378. The rule is the same regardless of the party

petitioning for the granting of an issue: *Kane's Estate*, supra, 534. It is the function of the hearing judge to determine whether there is a substantial dispute upon a material matter of fact. He is not, however, to constitute himself the jury. If a substantial dispute does exist, even though the verdict might be at variance with the opinion of the judge, the issue must be granted: *DeLaurentiis's Estate*, supra, 79.

Upon appeal to this Court the chancellor's decision will not be reversed unless there appears to have been an abuse of discretion: *DeLaurentiis's Estate*, supra, 78; *Dible's Estate*, 316 Pa. 553, 554. In determining whether there has been such an abuse of discretion by the court below we have considered all the evidence. If a jury were to believe the evidence of appellant, a verdict upholding the instrument as the will of Mrs. Lare could be sustained. On the other hand, if the evidence of appellees were believed, a verdict that the putative will was a forgery could also be sustained. The evidence adduced by appellees is not so positive and unimpeachable that appellant's evidence can be dismissed from consideration as a matter of law. Appellant has established more than a prima facie case. See *DeLaurentiis's Estate*, supra, 77. It cannot be said as a matter of law that the evidence adduced by the proponent of the will is so inherently weak that a jury should not be permitted to consider it.

We are of opinion that the chancellor erred in concluding that "no jury verdict sustaining the will could be permitted to stand" and in refusing to grant appellant's petition for an issue devisavit vel non. In so doing he has assumed the province of a jury and has determined material facts upon which there is a substantial dispute.

The decree of the court below is reversed and the appeal from the register of wills reinstated, with directions to award an issue devisavit vel non; costs to abide the result.

Concurring Opinion by Mr. Justice Allen M. Stearne:

I am in complete accord with the majority opinion.

The difference in opinion in this Court concerns the scope of the authority of a hearing judge in the orphans' court as to when he should grant or refuse an issue devisavit vel non. The majority have decided that the exclusive function of such hearing judge is to determine *whether there exists a substantial dispute of fact.* The minority view is that the *hearing judge* may conclude, despite the testimony, that *he* would not support a verdict of a jury and therefore no substantial dispute exists.

To my mind whatever confusion appears is largely due to inapt and unfortunate expressions in some of the cases. It particularly appears in cases where the orphans' court has been required to determine whether or not the dispute is *substantial.* It is also apparent in defining the function of a *trial judge* without a jury, where, under the cases, such judge acts as a chancellor.

Because of the large number of reported will contests, it would be neither practical nor useful to attempt to collect and discuss or distinguish them. There has been expended much learning and effort upon this important branch of the law. Like all other matters of legal development, earlier views have been subjected to modification. This Court has not hesitated to declare, in at least one instance, that its earlier view was mistaken. See *Cross's Estate,* 278 Pa. 170, 180, 122 A. 267.

The case of *DeLaurentiis's Estate,* 323 Pa. 70, 186 A. 359, is perhaps the latest leading authority upon the subject now under consideration. Mr. Justice Horace Stern has concisely and accurately defined the function of an orphans' court judge sitting to determine whether a substantial dispute exists: ". . . the judge of the orphans' court conducting the hearing is not to constitute himself the jury, that is, to decide the case as he would if acting in the capacity of an ultimate fact-finding tribunal. His function is to decide whether there is a

substantial dispute upon a material matter of fact, and such a dispute exists if a verdict that might be reached by a jury, even if at variance with his own opinion, would not have to be set aside as judicially untenable because contrary to the weight of the evidence. . . ." We have repeatedly reaffirmed this principle: *Kline's Estate,* 322 Pa. 374, 378, 186 A. 364; *Hunter's Estate,* 328 Pa. 484, 492, 196 A. 35; *Noble's Estate,* 338 Pa. 490, 492, 13 A. 2d 422; *Porter's Estate,* 341 Pa. 476, 482, 19 A. 2d 731; *De Silver, Admrs., v. Pa. Trust Co.,* 342 Pa. 320, 322, 20 A. 2d 761; *Young Estate,* 347 Pa. 457, 459, 32 A. 2d 901; see also *Patti's Estate,* 133 Pa. Superior Ct. 81, 83, 1 A. 2d 791.

A review of this record has convinced me that the learned hearing judge of the orphans' court misconceived his statutory function. He constituted himself a jury and decided the case as he would have done if acting in the capacity of the ultimate fact-finding tribunal. With substantial conflicting evidence, he found as a fact that the proponent had forged the·questioned testamentary writing. He then held, in effect, that because of such finding he could not support a verdict of a jury in favor of the will and consequently no substantial dispute existed. He declined to award an issue. This, in my view, was clearly error.

At the outset we are met with a constitutional provision (Article 1, section 6, of the Constitution of the Commonwealth): "Trial by jury shall be as heretofore, and the right thereof remain inviolate." In *North Pennsylvania Coal Co. v. Snowden,* 42 Pa. 488, 491, this Court said: . . . "if there is any right to which, more than all others, the people of Pennsylvania have clung with unrelaxing grasp, it is that of trial by jury. They brought it with them from the land of their fathers. In every constitution which has been adopted, they have taken care to secure it against infringement, and put it beyond the power of either the executive, the legislature or the courts to take it away from any individual. . . . The

judiciary, no more than the legislature, can deny to any litigant the right of trial by jury, in a case appropriate to such a mode of trial.".

The orphans' court, within the scope of its jurisdiction, acts as a court of chancery. A trial in that court, is a trial by a single judge. Such court, being a court of limited jurisdiction, exercises only such power as is given by statute, *Cutler's Estate,* 225 Pa. 167, 73 A. 1111; *Cutter's Estate,* 286 Pa. 505, 134 A. 489; *Watson's Estate,* 314 Pa. 179, 170 A. 254; *Mains's Estate,* 322 Pa. 243, 185 A. 222; *Gilbert Estate,* 350 Pa. 13, 38 A. 2d 277. It is a special tribunal for specific cases, and when so acting, applies the rules and principles of equity: *Brinker v. Brinker,* 7 Pa. 53; *Willard's Appeal,* 65 Pa. 265; *Douglas's Estate,* 303 Pa. 227, 154 A. 376.

The Orphans' Court Act of June 7, 1917, P. L. 363, section 21(b), 20 PS 2582 (re-enacting section 41 of the Act of March 15, 1832, P. L. 135), provides: "Whenever a dispute upon a matter of fact arises before any orphans' court, on appeal from any register of wills, or on removal from any register of wills by certification, the said court shall, at the request of either party, direct a precept for an issue to the court of common pleas of the county for the trial thereof. . . ."

For a review of the cases under section 21(b) of the Orphans' Court Act and the preceding section 21(a) see opinion of Chief Justice MOSCHZISKER in *Cross's Estate,* 278 Pa. 170, 122 A. 267. He clearly defines when such an issue is *mandatory* and when *advisory.* See also historical data in dissenting opinion of Justice SIMPSON in *Fleming's Estate,* 265 Pa. 399, 415, et seq., 109 A. 265.

Again, for the sake of brevity, it will suffice to state that it is well-settled that the function of the orphans' court in merely seeking to ascertain whether a substantial dispute exists, does not deprive the parties of the right to a jury trial. It is only where such a dispute exists that the parties are entitled to demand a jury trial. The dispute must be *substantial* and not a mere

conflict in the testimony: *Guar. T. & S. D. Co. v. Heiden-reich,* 290 Pa. 249, 251, 138 A. 764. Thus, for example, if a will is alleged to have been forged, but two reputable subscribing witnesses testify that they saw testator affix his signature; testator's banker, lawyer, physician and other friends, as well as a handwriting expert, all testify that the signature is that of the testator, then the mere opinion of a tradesman that he did not believe the signature to be that of the testator, would not be sufficient in weight for the court to declare that the conflict in testimony was a *substantial* dispute which would necessitate the award of an issue.

When an issue is awarded in a will contest, the verdict, where properly sustained by the court of common pleas, (or orphans' court trying the case with a jury under the Act of July 1, 1937, P. L. 2665, 20 PS 2585), is conclusive and binding on the orphans' court: *Cross's Estate,* supra. In that case Chief Justice MOSCHZISKER said (page 184) : "Where a substantial dispute exists on a material point of fact concerning the status of an alleged will or testamentary writing, and the evidence is of the probative value required by our decisions, the orphans' court must send such issue to the common pleas when requested so to do by any party in interest, if that request is made in due season. . . . After judgment entered on the verdict in the common pleas, so long as the judgment stands undisturbed, the findings of fact by the jury of that tribunal are conclusive on the orphans' court, (a) whenever the issue is of the class mentioned in Rule 2,—whether sent to the common pleas on request or otherwise,—or (b) when it involves the decision of a fact upon which depends the jurisdiction of the orphans' court." But in presenting the evidence before the *trial judge* and a jury "The trial judge, who sits to determine an issue devisavit vel non, acts as a chancellor. He is not bound by a verdict when it is against the manifest weight of the evidence, which is addressed to him quite as much as to the jury. If his professional and official

conscience is not satisfied that it is sufficient to sustain a verdict against the will, either because it lacks probative force or inadequacy, it becomes his duty to set the verdict aside: *Kustus v. Hager,* 269 Pa. 103; *Keller v. Lawson,* 261 Pa. 489; *Englert v. Englert,* 198 Pa. 326": *Brehony, Exr., v. Brehony,* 289 Pa. 267, 270, 137 A. 260. See also: *Guar. T. & S. D. Co. v. Heidenreich,* supra; *Buhan v. Keslar,* 328 Pa. 312, 194 A. 917.

Upon a petition, answer and replication in the orphans' court for an issue devisavit vel non, under section 21(b) of the Orphans' Court Act of 1917, supra, on the allegation of a substantial dispute, the court must necessarily dispose of the application in one of three ways: (1) Grant the issue, (2) refuse the issue and sustain the will or (3) refuse the issue and declare the will invalid. In this field are hundreds of varying cases, but I shall only consider a few in each classification, as examples of the method by which they have been treated:

(1) Granting an issue: *Sharpless's Estate,* 134 Pa. 250, 19 A. 630; *Kline's Estate,* 322 Pa. 374, 186 A. 364; *DeLaurentiis's Estate,* supra. In each of these cases there existed a well-defined, substantial dispute, the determination of which depended upon a verdict by a jury.

(2) Refusing an issue and *sustaining* the will: *Lowe's Estate,* 318 Pa. 497, 178 A. 820; *Rosenthal's Estate,* 339 Pa. 488, 15 A. 2d 370; *Porter's Estate,* 341 Pa. 476, 19 A. 2d 731. In each of these cases the contestants' evidence, viewed in its most favorable light, did not measure up to the standard necessary to nullify the testamentary writing.

(3) Refusing an issue and declaring the will *invalid:* *Fleming's Estate,* 265 Pa. 399, 109 A. 265; *Culbertson's Estate,* 301 Pa. 438, 152 A. 540; *Morgan's Estate,* 146 Pa. Superior Ct. 79, 22 A. 2d 87. In *Fleming's Estate,* the forgery was established by incontrovertible physical facts, such as presence of carbon on the signature, and by testimony which the majority of the court regarded

as overwhelmingly refuting the rather fantastic and dramatic story of the finding of the will and its execution by a surviving witness. Justice SIMPSON filed a vigorous dissent, regarding the matter as a jury question. In the *Culbertson* case the confession of the forger was established, and was corroborated by incontrovertible physical facts. Again no substantial dispute was held to exist and the will was stricken down. In the *Morgan* case the mental incapacity of decedent was so completely proven that the extremely weak testimony of the proponent did not overcome the established facts.

From a consideration of the foregoing, it plainly appears that the orphans' court hearing judge is limited by statute to a single inquiry, to wit: *is there a substantial dispute?* He is not, in such capacity, to be confused with a chancellor who, with the aid of a jury, is the trier of fact. At times the hearing judge must weigh the evidence in order to ascertain whether the dispute is *substantial.* Beyond this he may not go. I am convinced that the rule, which is so accurately stated in *DeLaurentiis's Estate,* supra, is the correct exposition of the law and should be followed.

The testimony and the court's opinion in the present case have been examined with care. The judge has found, as a fact, that not only is the signature to the will forged, but that the typewriting was superimposed by the proponent over the forged signature. The judge states in his opinion: "No person called as a witness claims to have direct knowledge of the forgery of the alleged will. The evidence offered by both sides consists of circumstantial evidence and the opinions of experts."

Proponent testified that he found the disputed writing in his wife's handbag and he was corroborated by two witnesses. Four bank officials and a handwriting expert testified to the genuineness of the signature. Proponent denied that he had typewritten the words of the will. The contestants' evidence consisted largely of circumstantial evidence, opinions of experts and deduc-

tions and inferences to be drawn from the testimony. Concisely stated, contestants point to the fact that the will was written upon a blank check, a very unusual circumstance; that decedent frequently signed blank checks and carried them about with her; the improbability that decedent would disinherit her nearest of kin in favor of the proponent, her husband; the advice of the attorney for the decedent to the proponent that he should tear up the will because, in the attorney's opinion, it was a forgery; the improbability of the proponent's testimony concerning the discovery of the alleged will; the proponent's threatening language in attempting to discourage a will contest; that decedent was a skilled typist, whereas the proponent was an amateur; that decedent, at or about the time of the date appearing on the will, carried a fountain pen filled with green ink, whereas the will was signed with black ink; that the check was old, whereas the typewriting was fresh, and many other arguments and conclusions to be drawn from the surrounding facts and circumstances.

It appears to me that this testimony, considered as a whole, discloses the existence of a substantial dispute of fact. If what the proponent and his witness have testified to is true, the probate of the will should not be disturbed. On the other hand, if what the contestants' witnesses say and infer is correct, then the proponent did forge the will and it should be annulled. This is a typical dispute of fact under Section 21(b) of the Orphans' Court Act, supra, which, under the Constitution, proponent has the right to have tried by a jury.

I cannot agree that the minority statement that on this record no verdict sustaining the will offered for probate could possibly be allowed to stand is a sufficient reason to deny the proponent's statutory right to a trial by jury. While a verdict of a jury will not be lightly set aside, the *trial judge,* sitting as a chancellor and also subject to review by the appellate court (*Guar. T. & S. D. Co. v. Heidenreich,* supra), still has complete control

over the verdict. In my opinion we should continue to follow, and not depart from, our declared law and practice.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE MAXEY:

I dissent from the majority of the opinion in this case. The issue raised by a petition to set aside the order of the Register of Wills and to revoke the letters of administration C.T.A. issued to M. R. Lare, Jr., was thoroughly litigated before Judge MILHOLLAND, of the Orphans' Court, in a protracted hearing which lasted, with brief recesses, from July 9th to July 23, 1943. The record before us comprises 3,290 pages. It was the conclusion of Judge MILHOLLAND that the will was a forgery and that no jury verdict sustaining it could be permitted to stand. Exceptions were filed to this adjudication, and these were argued before the court en banc, consisting of Judges TRIMBLE, PATTERSON and MILHOLLAND. The court en banc adopted Judge MILHOLLAND'S findings and conclusions that the alleged will was a forgery. I agree with Judge MILHOLLAND and the court en banc that the will is a forgery and that no jury finding in its favor could be sustained. There is no reasonable expectation that any further light would be thrown upon this case by a jury trial. The record of such a trial would presumably be about the same as the record now before us. On this record a verdict sustaining this alleged will would be most unlikely and to sustain such a verdict would be shocking to any judicial conscience.

All agree that the law is settled that the Orphans' Court has the right to decide in a will case whether or not an issue to determine the validity of an alleged will should be awarded. The constitutional right to a trial by jury has no relation whatever to the power of the Orphans' Court in such cases, for the Orphans' Court acts as a court of chancery and "in the exercise of its limited jurisdiction . . . it applies the rules and principles of equity": *Willard's Appeal,* 65 Pa. 265, 267-8.

It is likewise settled that if there is a substantial dispute upon a material matter of fact, the Orphans' Court must award an issue; if there is no such substantial dispute the Orphans' Court may properly refuse to award an issue. Mr. Justice HORACE STERN in *DeLaurentiis's Estate,* 323 Pa. 70, 186 A. 359, after reviewing our cases aptly states: ". . . the principle is laid down in unmistakable though variously expressed terms, that a party is not entitled to have an issue submitted to a jury merely because he produces enough evidence to make out technically a prima facie case."

" 'The true rule is that such a case should not go to the jury at all when the court in the exercise of a sound legal discretion would not sustain the verdict': *Eddey's App.,* 109 Pa. 406, 419.

" 'If the testimony is such that after a fair and impartial trial, resulting in a verdict against the proponents of the alleged will, the trial judge, after a careful review of all the testimony, would feel constrained to set aside the verdict as contrary to the manifest weight of the evidence, it cannot be said that a dispute, within the meaning of the Act, has arisen': *Appeal of Knauss,* 114 Pa. 10, 20. . . .

" 'As the rule is usually stated, an issue should be denied in a case where, after a careful consideration and review of all the evidence, the trial judge would feel compelled to set aside a verdict, if found for the petitioner, as impossible and improper on the strength of the evidence, . . . To sustain the grant of an issue, the evidence must be such as would permit a verdict for either party to stand. Otherwise, there is no substantial dispute upon a material question of fact': *Hile's Est.,* 310 Pa. 541, 544."

I have carefully read the record in the case, and I fail to see how any court could sustain a verdict in favor of this will (written on the face of a bank check) should a jury be misled into returning such a verdict. Even if we concede merely for the sake of argument that this

proponent has made out "technically a prima facie case" that is not enough, under our decisions, (as Justice STERN pointed out) to warrant submitting an issue to a jury.

In human affairs we accept as true those things which are highly probable and as untrue those things which are highly *im*probable. Thayer in his "Treatise on Evidence," says, p. 272: "What is called the 'legal mind' is still the human mind, and it must reason according to the laws of its constitution." That Mrs. Lare ever wrote the will her husband presented for probate is so highly improbable that only an immature and gullible mind would believe it. The following are some of the circumstances which convince me that this will is a fraud:

1. While, of course, a will can be written on a bank check form, it is so unusual for anyone to do so when ample paper is available and there is no necessity to write a will on a bank check form, that when an alleged will so written is offered for probate it naturally excites suspicion as to its genuineness. Before it is accepted as a will there ought to be some plausible explanation as to why the alleged testator chose to write a will on such a small piece of paper, and on the side of it which contained printed matter instead of the side of it which was blank. The bank check form allegedly used for the writing of this alleged will was 6-3/8 inches in length and 2-5/8 inches in width. It contained about one inch from the top the printed words "Forbes National Bank." Near its right end and about an inch from the bottom it contained the word "Dollars," and about one inch above that word and a little to the left of it is a dollar ($) sign, and near the top are the words "Pittsburgh, Pa. No." and on the left side are the words: "Pay to the order of." Mrs. Lare, the alleged maker of this alleged will had had business experience and had been a "skillful typist." From 1919 to 1929 she had been secretary to the General Sales Manager of a cement company. A person of ordi-

nary business sense and experience would not be likely to use a *blank check* as a paper on which to write her will disposing of property of the value of $80,000, and if because of some unusual circumstance she did use a blank check for that purpose she would naturally use *not* the already partially occupied face of the check but the totally unoccupied back of it. There is probably not a single instance anywhere of any person using the *face* of a "blank" check containing the usual printed matter, on which to typewrite a *will*. Mrs. Lare, who had been a trained secretary, doubtless had plenty of paper available for the writing of a will in the usual form and would not have resorted to her check book for paper on which to express her testamentary intentions.

2. It was shown that Mrs. Lare had the habit of signing checks in blank. This fact was inferentially admitted by Lare who testified that he once told his wife he "would not give or take a blank check from Jesus Christ; it is too dangerous." This alleged will was evidently written on a blank check form on which Mrs. Lare had carefully written her name on the signature line, intending that the form should later be filled out as a *check*. The blank on which this "will" was written was taken from the check book between *May 13th and 16th, 1940*. The will bears a date *twenty months later*, i.e., January 21, 1942. Each check book of 201 checks which Mrs. Lare used, lasted about one year. She did not use a new book until all the checks in the preceding book were used. It is unthinkable that anyone writing a will on January 21, 1942, on a blank check, would use one from a book that had been depleted of all its blanks nearly two years previously? The obvious inference is that Lare had obtained possession of a blank but signed check of his wife's in *1940* and had carefully retained it for the very fraudulent purpose for which he used it twenty months later. The paper on which this alleged will was written shows unmistakable signs of having been kept for a long period (See "#12," post).

3. It is highly improbable that the decedent who inherited all her estate from her first husband who died in 1935, would leave all her estate to her second husband whom she married thirty-eight months before the alleged will was executed, to the exclusion of her two surviving brothers and one sister. One brother was in 1942 about 35 years of age, and the other about 52 years of age, and the sister was about 40 years of age. Mrs. Lare's relations with them were amicable. She had talked to her attorney, J. Kirk Renner, and expressed her desire to make a will in which provisions would be made for her brothers and her sister and their children. Mrs. Lare's attorney testified that in one of the last of Mrs. Lare's many telephone conversations with him, she spoke of a plan to visit his office in Connellsville, as soon as she should recover from her illness, to carry out a plan to make a will providing for "Katherine and the boys," meaning the three contestants who are appellees here, "and their children." Lare himself admitted that Mrs. Lare "thought warmly of her family." There was evidence that she expressed a belief that Mr. Lare "had married her for her money." The court found that "old, established friend of the decedent, who knew her well enough to learn from her that her life with Mr. Lare was a most unhappy one, [testified that] one of the principal causes of her unhappiness was that she was unwilling to forget her regard for contestants or to abandon her practice to make material provisions for them in the face of Mr. Lare's jealous and bitter opposition."

4. Attorney Renner had been the executor of the will of Mrs. Lare's first husband, who left all his estate to her. Mr. Renner continued to do all her legal work until her death. She trusted him so implicitly that she sent him "checks signed in blank to be used after he filled them in, for the correct amount, to the proper payees." She wrote him and told him about her anxiety to make a will "to take care of her sister and brothers." During the last three or four months of her life" she talked to

Attorney Renner on the telephone. *Yet she never mentioned to this* trusted attorney and personal adviser anything about the will which was offered for probate in this case and which bears the date, January 21, 1942. In *Young Estate,* 347 Pa. 457, 32 A. 2d 901, one of the five circumstances we listed as tending to prove that the will challenged in *that case* was a forgery was the fact that at no time after the date of the alleged will (which was adjudicated to be a fraud) did the person whose name was attached to the will ever discuss that will with the attorney whom she consulted on her personal business affairs. We there said (p. 462): "The silence of this woman in the presence of the man whom she had consulted professionally during a dozen years, about a will these proponents declare she had executed six weeks previously and in which this man was named one of the executors, would generate even in the mind of the gullible a formidable doubt as to this declaration's veraciousness." If that was true in the *Young case,* it is equally true in this case.

5. A most significant circumstance against the genuineness of Lare's claim that this blank check "will" is his wife's will is the fact that after his wife's attorney, J. Kirk Renner, had told him "If I were in your position I would not attempt to probate that as Gertrude's will," that the "will" was a forgery and to "tear it up," he requested Mr. Renner to become his attorney and secure for him the probate of the paper as a will. Lare admitted in his testimony that Attorney Renner said to him: "Tear it up! I would not probate that will." Lare then became "very excited, jumped from his chair, began pacing back and forth" and said: "You don't think I would do anything like that, do you? [evidently meaning to forge a will]. I put men in the penitentiary for less than that." [1] After this interview with Attorney Renner, Lare waited two or three weeks, i.e., until July

---

[1] Lare had been a bank examiner and presumably had in his work encountered forgeries.

31st, before offering the "will for probate." When asked why he held the will so long after this interview, Lare replied: "I wanted him [Renner] to state in writing to me his position."

It is unthinkable that a man offering to engage his deceased wife's lawyer to help him probate an alleged will of the man's wife, would persist in requesting that lawyer to represent him after the lawyer had in effect characterized the will as a fraud, unless the man himself knew that the will was a fraud and hoped to stifle the lawyer's opinion of that will by engaging him as counsel. No man with an honest will in his possession would think of engaging as his counsel in the probate of that will a lawyer who pronounced the will spurious.

6. Lare's testimony as to where the alleged will was found and how he found it greatly strengthens one's conviction that this "will" is a fraud. Mrs. Lare had in her home a steel filing cabinet, with a lock on it, in which she kept stock certificates, fire and automobile insurance policies, title to car, war savings bonds and other valuable papers. *Yet her will disposing of property worth $80,000 was not kept in this box,* but Lare found this will, so he says, "in the last place in the world I would expect to find it," in her wallet. He found it there, so he says, when he was looking for her automobile registration card which he wanted in order to obtain the manufacturer's number of Mrs. Lare's automobile. He could easily have obtained this from the title certificate which he well knew was in the steel box to which he had the key. Though Lare quickly found the registration card in the wallet, he did not at once use the information thus obtained for the necessary inscription of the Federal Stamp Tax (his avowed purpose), but he kept on searching in the wallet and "in the right hand compartment having the flap over it" he found the "will." He says "he then sat there and started to bawl." It is indeed strange that Mrs. Lare would carry her will in her wallet, though all other valuable papers were

carefully kept in a steel cabinet, and it is equally strange that she had never informed her attorney or even Lare himself or anyone else of the existence of this will, though she held frequent communications with her attorney *after* the date of the alleged will.

7. Another circumstance which is highly condemnatory of Lare's good faith in this matter is found in the threatening language he used in an obvious attempt to discourage the contest of the "will" he offered for probate. After Attorney Renner refused to represent Lare, the latter wrote Renner under date of July 17, 1942, inter alia, as follows (Rec. 3304a): "In regard to the possibility of contest, I have nothing whatsoever to fear. . . . In event of any attack you will of course be in a vulnerable spot for you will have to testify as to what ever you may know about anything. You will be in the meleé even if you would like to stay out. While I will not push you I know that you will be pushed and plenty hard." Then he said: "It will be rather hard for them [his wife's brothers and sister] to hear their heritage from the mouths of the doctors and nurses who have attended Pat for the last few years. I cannot help that." The word "heritage" is a little cryptic, but apparently Lare was threatening disclosures which might embarrass the brothers and sister. This letter evidenced a desire on Lare's part to blackmail both Attorney Renner and the relatives into silence, so that he could reap the fruits of the alleged "will," which Attorney Renner had discredited. What this court said in *McHugh v. McHugh,* 186 Pa. 197, 203, 40 A. 410, is apposite here: ". . . evidence of the misconduct of a party in connection with the trial is admissible as tending to show that the party guilty of the misconduct is unwilling to rely on the truth of his cause, or is conscious that it is an unjust one."

8. When we consider that the established fact that Mrs. Lare was a skillful and experienced typist, this spurious "will" *shows on its face* that it was never

typed by her. As Judge MILHOLLAND aptly said in his opinion: ". . . the contestants offered the testimony of two experts, Mrs. Grace Martin Cornelius and Mr. Nernberg. . . . Both of these experts working independently of each other, reached the same conclusion: that the typewriting on the alleged will could not possibly have been the work of a typist having professional training and experience, such as was possessed by the decedent, and that the errors and peculiarities of the typewriting on the alleged will were the same as those which consistently appeared in all the admitted typewriting works of Mr. Lare. The peculiarities referred to by both of these experts were the uneven touch reflected in the varying blackness of the letters in the alleged will; the awkward confusion of the word "all" with the printed "$"; the peculiar single spacing after periods, which would never occur in the work of a typist having the training and experience of the decedent; the erratic misalignments in the body of the will; the inconsistent misalignment of the date and the punctuation of the closing sentence of the alleged will." That all skillful typists make *two* spaces after a period was proved and is obvious from the casual inspection of well typed letters. Appellant concedes."it appears in the record that Mr. Lare's typing does show the habit of making [only] one space after a period." Six samples of Lare's typing each show a single space after periods, as does the "will" he offers for probate. A trained typist, as Mrs. Lare was, would leave two spaces after each period. Two experts on typing testified that it was Lare himself who typed this challenged paper and the reasons they gave for their conclusion are convincing.

9. There are on the blank check form used for this will 12 printed words and a printed "$" sign and the numbers 8-139. None of these had been obliterated. It is obvious that *if* a skillful typist used the face of this check form for the purpose of writing a will on it, she would have "blotted out" the above words and sign and num-

bers. No person of Mrs. Lare's long experience as a secretary would on such an important document as her will, allow the printed words "Forbes National Bank" and "Pay to the Order of" to appear in it when they serve no purpose there. These printed words would naturally induce a trained typist if she was going to use a "blank check" to write a will to use the *back* of the check on which no printed words or signs or numbers appeared.

10. Judge MILHOLLAND and the court en banc concluded from the testimony of several credible witnesses that though Mrs. Lare was a skillful typist, she during the latter years of her life avoided the use of a typewriter. It is therefore improbable that Mrs. Lare would revert to the use of the typewriter in order to write a 43 word will.

11. On January 9, 1943, at Mr. Lare's direction, his counsel addressed to Mr. Nernberg and Mr. Fearon (the expert witnesses employed by Lare) identical letters which purported to offer for their inspection several hundred specimens of his dead wife's *handwriting,* and which requested that the two experts compare these with the signature on the alleged will, and so determine whether the latter was or was not genuine. Neither of the experts employed by Lare offered any specimen of Mr. Lare's *typewriting,* or suggested the existence of any specimens of Mrs. Lare's typewriting, or the possibility of any comparison of either Mr. Lare's or the decedent's typewriting with that appearing on the alleged will. Though Mr. Lare engaged an expert, E. C. Leslie, and through the latter asked Lare to furnish him samples of Mrs. Lare's "work on the typewriter" and though he repeated these requests during the months preceding the trial, Lare did not furnish samples of her typewriting, (except a few unsatisfactory carbon copies). As a result, Mr. Leslie was never able to form any opinion of the genuineness or forgery of the *type*writing on the alleged will. His testimony indicates that he devoted

himself to the study of Mrs. Lare's *signature*. He testified (2319a) that he saw some carbon copies of Mrs. Lare's typing and when asked whether these carbon copies were satisfactory he answered "They were satisfactory to the extent that I could not say whether Mrs. Lare typed or did not type the will, I could not honestly say she did or honestly say she did not."

12. Another circumstance which stamps this "will" as fraudulent is the fact that although the typing on this paper was comparably fresh, the paper itself showed age. It had lost most of its gloss and color and crispness. The court below concluded from the evidence that "the paper [the blank check] was old and worn when the typewriting was inscribed on it."

These twelve most significant circumstances by no means exhaust the evidence which convinces the court below as it does the writer of this opinion that Mrs. Lare never wrote this alleged will. This evidence is equally conclusive that it was Mr. Lare himself who wrote this alleged will, but we will not herein review this evidence which so certainly connects him with this palpable fraud. The court below could not reach any other conclusion than it did reach in this case and if the issue had been submitted to a jury, and if the jury had for any reason found a verdict in favor of this alleged will, no court could permit it to stand.

The majority opinion seems to be based upon the idea that the basic question in this case is whether or not *Mrs. Lare's signature* on the challenged will *is a genuine signature or a forgery*. This is *not* the basic issue. The basic issue is: is this proffered paper Mrs. Lare's will or is it spurious and therefore a fraud. If Mrs. Lare signed a check form not filled out (as was her custom) and if her husband came into possession of such a paper and if he over her genuine signature wrote a will, without her authorization, that will is a forgery. That this appellant, Marcellus R. Lare, Jr., did write this alleged will over his wife's signature on a check which she prob-

ably signed "in blank" (as apparently was her custom) is to my mind conclusively demonstrated by the evidence now before us.

The majority opinion says: "If a jury were to believe the evidence of appellant, a verdict upholding the instrument as the will of Mrs. Lare would have to be sustained." The same thing could be said of the evidence of every fraudulent claimant in history. I cannot conceive of any honest and intelligent jury believing Lare's testimony. The chancellor and the court en banc did not believe Lare's testimony and characterized "much of it" as "evasive and contradictory." Lare's claim that his wife and not he typed the "will" is contradicted by an array of facts which proclaim the alleged will a sham. Lare had a strong motive to lie in this case for if his testimony is accepted he will receive not merely half of his wife's $80,000 estate under the intestate laws (which he gets in any event), but also the other half of her estate under a will which he undoubtedly criminally fabricated. As the court below said: Lare "had the motive and the opportunity to take this means of obtaining the estate."

If the proponent of a paper testamentary in form but which so unmistakably reveals its fraudulent character as does the paper Lare produces is entitled to have his "evasive and contradictory" testimony in support of it submitted to a jury so that the latter may, if it chooses, declare it to be a will, it is difficult to see what logical limit can hereafter be placed on imposters who claim the "right" to have their forgeries masquerading as wills submitted to a jury. If an issue D.V.N. is to be awarded in a case so plainly a cheat as this case is, such issues should hereafter be awarded "as a matter of course."

The evidence of the appellant as to the *genuineness of Mrs. Lare's signature* on this alleged will *can* be accepted without disturbing the conclusion which this evidence so imperatively requires that Lare came into possession of a blank check bearing Mrs. Lare's genuine

signature and then fraudulently wrote above that signature what he now offers as her will. The genuineness of Mrs. Lare's signature is not the real issue in this case.

We have repeatedly said that the decision of the court below in cases like this will not be reversed unless the decision was an abuse of discretion.

In *Fleming's Estate*, 265 Pa. 399, 109 A. 265, the facts were that an alleged will was offered for probate and it purported to be witnessed by three persons. Two of these witnesses were dead at the time the will was offered but the surviving witness testified that the signature on the will was decedent's, and other witnesses testified to the genuineness of the testator's signature and of the signatures of the deceased "subscribing witnesses." The Orphans' Court denied an issue to the proponents of the alleged will. It based its decision on the facts that the alleged will contained words and names inconsistent with decedent's education and knowledge, that it did not carry out his expressed intentions as to the disposition of his estate, that the story told to explain the delay in producing the will was highly improbable, that there was evidence of the spurious character of the signature of the second witness and that the signature of one of the subscribing witnesses was a forgery and that the presumptive beneficiary of the will was not the person the decedent had ever declared his intention to make his principal beneficiary. In that case this court affirmed the action of the court below, and said, inter alia: "Fraud, of which forgery is a glaring example, is one of the principal grounds of equity jurisdiction, and, as a general rule, equity may decree the cancellation of a written instrument found to be a forgery: 9 Corpus Juris, 1195" and other authorities and cases. This court also said: "When a court is considering the validity of written instruments as affected by undue influence, fraud, forgery or incapacity, it is considering equitable questions where in jury trials are not, and were not when our first state constitution

was established, a matter of right; and its declaration that 'trial by jury shall be as heretofore,' has no application to cases where such trial was not then demandable." (Citing cases). . . . " 'Unless provided by statute the parties to a contested will case have no right to a trial by jury': 6 Am. & Eng. Enc. of Law (2d ed.), p. 979; and the same rule applies generally in probate courts: Ibid, p. 979; see also 24 Cyc. 104."

The case now before us differs from the case just cited principally in the fact that in the instant case the perpetrator of the fraud was clever enough to use what is probably a genuine signature; his fraud was in the typewriting which was done above the signature, clearly not by the wife, obviously by the husband, and whose effect is to give the entire estate of the wife to this husband of 38 months (when the "will" was made) to the exclusion of the wife's two brothers and one sister. In *Fleming's Estate* there was at least one "subscribing witness" whose signature apparently withstood all attacks made upon its genuineness, and yet this court held that the Orphans' Court reached a right decision in refusing an issue. In the instant case there was no subscribing witness and all the facts and circumstances furnish conclusive proof of the fraudulent character of the will offered by Lare.

In *Culbertson's Estate*, 301 Pa. 438, 152 A. 540, Judge GEST of the Orphans' Court found as a fact that a will probated twelve years before was a forgery and set its probate aside. In sustaining Judge GEST's actions this court said: "It is needless, in passing upon the merits of the case, to refer to the unbroken line of authorities which hold that the facts as determined by the orphans' court are conclusive upon us where based upon sufficient evidence, and an examination of the record shows those made here to have been fully justified."

In *Central Trust Co., Exr., v. Boyer*, 308 Pa. 402, 162 A. 806, this court, speaking through Mr. Justice DREW, said: ". . . in the trial of an issue to determine

the validity of a will, the judge sits as a chancellor . . . ; the evidence is addressed to him as to the jury, and he cannot permit the jury to do what he, as a chancellor, would not do." (Citing cases.) To the same effect is *Wagner's Estate,* 289 Pa. 361, 367, 137 A. 616, where we said that the probate of a will will be set aside "when, in good conscience, a verdict of a jury, sustaining the will, could not be approved." Since the evidence in this case has been before a chancellor in the Orphans' Court and their opinion is unanimous that the will is a fraud, why should this case be retried before a jury when the chancellor and the Orphans' Court would in the exercise of their sound discretion set aside any verdict in favor of this will, should such a verdict be returned, for such action would be imperatively called for on testimony such as that now before us.

In *Noble's Estate,* 338 Pa. 490, 13 A. 2d. 422, this court said in an opinion by Mr. Justice LINN. "In *Tetlow's Estate,* 269 Pa. 486, 494, 112 A. 758, we said: 'It is the established law of Pennsylvania that, in cases of the character of the one now before us, the judge is vested with power to decide whether or not he shall submit oral evidence to the jury, even though it be conflicting. It is his right and duty, after weighing the whole evidence impartially, to refuse to present it to the jury unless he either feels the ends of justice call for a verdict against the will, or is so uncertain on this point that he could conscionably sustain a finding either way on one or more of the controlling issues involved.'"

A study of this record convinces me that no other decision than that reached by the Chancellor and the court en banc is possible. Though the evidence is all in and a just conclusion reached,[2] the majority opinion decides that this tedious case must be tried again by the Chancellor, in the presence of a jury. If the jury decides

---

[2] Men have been justly convicted of murder by circumstantial evidence no more conclusive than the circumstantial evidence offered in this case to prove the bank check "will" a fraud.

against this alleged will, the result will be the very result the court below reached. If the jury by any chance decides in favor of the will, the court below will set the verdict aside and again declare the will a fraud. What possible good can be accomplished by again taking testimony duplicating the 3,290 pages of testimony already taken, and which so conclusively proves that Lare's claim that his wife bequeathed him, to the exclusion of her brothers and her sister, all of her $80,000 estate by typing [3] a will on the face of a blank check over her signature is spurious?

The paper offered by Lare as a will is an unmistakable counterfeit, and the decree of the Orphans' Court of Allegheny County saying so should be affirmed.

---

Dissenting Opinion by Mr. Justice Drew:

I cannot support the decision of the majority which reverses the Orphans' Court of Allegheny County and grants an issue d.v.n. in this case. The learned Chancellor, Judge Milholland, did not abuse his judicial discretion and his findings of fact are supported by the overwhelming weight of the credible testimony, and are binding upon this Court. This is all the more true because the action of the Chancellor was sustained by the learned court en banc.

In any attempt to apply the rules of law governing the right to an issue in any case, it is necessary to determine what issues of fact have been presented to the Orphans' Court; and then to determine the extent to which

---

[3] Lare's eagerness to furnish specimens of his wife's *hand*writing and his reluctance to furnish specimens of his wife's *type*writing (already referred to in this opinion under No. 11) speaks loudly as to his confidence that his wife's signature on the alleged will is genuine, and as to his fear that a thorough comparison of his wife's actual typing with the typing on the alleged testamentary paper will expose the latter as a fraud.

these issues have been made by the evidence the subjects of any real dispute.

Although the length of the record might suggest that this is a complicated case, the essential facts can be reduced to a very simple form. Since the Chief Justice, in his dissenting opinion, has marshalled the facts in a very thorough manner, I shall only touch upon them to the extent necessary to support my position.

The controlling issues here, and the Chancellor's disposition of each issue were as follows: First. Is the signature on the alleged will the handwriting of Mrs. Lare; and, if it is, did she sign the document before or after the typewriting was inscribed upon it?

On this point, Mr. Lare, proponent, relies wholly on the testimony of his expert, Mr. Leslie, corroborated by that of several lay witnesses, that the signature is in Mrs. Lare's handwriting. Mr. Lare offered no evidence tending to show that it was written in January, 1942.

To answer this, contestants showed, by physical comparisons of the questioned signature with admitted signatures of January, 1942, and of earlier years, corroborated by the testimony of their expert, Mr. Nernberg, that the questioned signature is quite different from genuine signatures of January, 1942, but very much like those of the earlier years—particularly signatures of May, 1940. These facts, as Mr. Lare's expert conceded, tend to show that the questioned signature was not written in January, 1942, and that it must, instead, have been written in May, 1940, or at some period similarly remote from the date of the alleged will.

Judge MILHOLLAND found, as a fact, that the signature could not have been written in January, 1942. This finding was of great importance, but it required the rejection of no evidence which had been offered by Mr. Lare.

Second. Was the typewriting on the alleged will the work of Mrs. Lare?

On this issue, Mr. Lare offered no evidence in the Orphans' Court. Since the hearing, and in this Court, he has attempted to compare the typewriting on the alleged will with that of Mrs. Lare's sister, Katherine M. Sayre, arguing that this comparison shows that the typewriting on the alleged will was the work of a skilled operator. This argument may be ignored, however. To justify its rejection, it is necessary only to observe that Mrs. Sayre was not a proficient typist; or to compare the typewriting on the alleged will with the work of an experienced typist on such a document as a Will or Deed.

To prove forgery of the typewriting, contestants showed that Mrs. Lare had been a highly proficient touch typist of many years' experience in business, but that she had avoided using the typewriter for any purpose during some years before her death—no sample of typewriting known to be her work was produced by anybody at the hearing. These things were not contradicted. Contestants offered also the testimony of their experts, Mr. Nernberg and Mrs. Cornelius, which was corroborated by the physical appearance of the typewriting on the alleged will, showing two things: that it could not have been the work of a skilled typist, and that its defects were the same as appeared in the many available samples of Mr. Lare's work produced on the same typewriter. This testimony was not contradicted by Mr. Lare's expert. It was contradicted only by Mr. Lare's denial, in rebuttal, that he had typewritten the alleged will; and the weight of this denial was lessened by the fact that, when he was required to operate the typewriter during the hearing, and so to provide samples of his work for comparison with that of the alleged will, Mr. Lare adopted a touch and a method of operating the machine which, as his own expert admitted, were most unnatural, and which tended to disguise and conceal the characteristics of his normal work.

Judge MILHOLLAND found, as a fact, that the typewriting could not possibly be the work of Mrs. Lare; and

that it was probably that of Mr. Lare. This finding was of the greatest importance; but it required the rejection of no evidence offered by Mr. Lare, except his denial of any part in the making of the alleged will, and Mr. Leslie's opinion that it is impossible to distinguish the work of skilled and unskilled typists.

Third. Was the alleged will a forgery or was it genuine?

To support the alleged will, Mr. Lare relied wholly upon the testimony of Mr. Leslie that the signature was genuine; upon his own denial that he had typewritten the document; and upon the contention that the alleged will was a natural one; i.e., upon letters addressed to him by Mrs. Lare which expressed her affectionate regard for him—but which made no reference to any plan to give him any portion of her estate; upon the testimony of two hairdressers and a comparative stranger, concerning declarations of her plans to provide for him in her will; and, finally, upon argument (refuted by Mr. Lare's own testimony) that Mrs. Lare, by January, 1942, has become estranged from the contestants, and her former friends and business associates.

To prove forgery, contestants relied on the facts that the signature was not written in January, 1942; upon admissions and the conduct of Mr. Lare, which showed that Mrs. Lare's regard for contestants and her former associate had not diminished to the time of her death; upon the testimony of her attorney, Mr. Renner, and various of her friends, which tended to show that she had entertained plans, both before and after January, 1942, to give portions of her estate to the contestants; and—more particularly—upon a multitude of physical facts and admitted circumstances. Among these were such things as the facts that the alleged will was typewritten on a blank check, which had been removed from Mrs. Lare's checkbook in May, 1940; that she had, during her lifetime, given blank, signed checks to persons she trusted—to Mr. Renner, admittedly, and to Mr. Lare

also, to judge by the appearance of his handwriting above her signature on a great many of her cancelled checks; that she had carried a blank, signed check in her purse at times shortly before her death; and that the alleged will had the physical appearance of an old, worn blank check on which a fresh, typewritten inscription had been impressed.

Judge MILHOLLAND concluded that the alleged will was a forgery and that no jury verdict sustaining it could be permitted to stand. To reach this conclusion, he relied on the two ultimate findings just described—concerning the signature and the typewriting, plus a number of circumstances which were, without important exception, open to no dispute. In other words, to sustain a finding of forgery, it was not necessary to reject any significant testimony offered by Mr. Lare, except that of Mr. Lare himself.

Thus, since nobody else had access to the typewriter used to write the will, the Chancellor found that, if Mrs. Lare had not typewritten the document, it must have been the work of Mr. Lare. But if he typewrote it —which followed from the finding of fact, discussed above, that Mrs. Lare did not—he was certainly guilty of perjury, and the alleged will was almost as certainly a forgery. Every other known circumstance of the case tended to corroborate that conclusion. Mr. Lare had the essential motive; his own testimony and his conduct at every stage of the matter showed that he desired greatly to obtain his wife's entire estate. He had the opportunity: it was conceded that his wife had not hesitated to carry and to issue checks bearing her signature, but otherwise in blank. The peculiarities of the instrument itself: those of its origin in the 1940 checkbook; those of its alleged discovery after Mrs. Lare's death; and those of Mr. Lare's attempts to maintain it, were all undisputed; and they all pointed to the conclusion of forgery.

The Chancellor's findings of fact in this case have the quality and weight of the verdict of a jury.

Mr. Lare's argument implies that this Court can and should review the evidence and determine for itself whether the Chancellor's findings are correct or not. This is a wholly mistaken idea, for several reasons of which the first is based on a well-known rule of equity practice.

In *Lowe's Estate,* 318 Pa. 497, 178 A. 820, the decedent was an elderly woman, and the contestant her son. By an admittedly genuine will made in 1931, she had conferred many benefits on the son. After her death, a paper dated 1934 was produced and offered for probate as a later will. The son (who stood to lose much under the new instrument) contested probate, contending that it was a forgery, and also that, if it were genuine, the testatrix had lacked testamentary capacity, and had been subject to undue influence. There were conflicts in the evidence on all issues. For example, a number of lay and expert witnesses testified that the signature was not genuine; this being met by testimony of the same kind that it was genuine. The Chancellor found as facts that the testimony in favor of the alleged will was true, and the testimony against it therefore false; and refused contestant's request for an issue d.v.n. His findings were approved by the Orphans' Court en banc. This Court held that such findings of fact are conclusive here (SIMPSON, J., p. 501):

"On the other two questions the hearing judge, later approved by the court in banc, said that, 'On consideration of all the testimony, we are of opinion that at the time she executed the will of January 13, 1934, testatrix was of sound mind and disposing memory, and it was executed after mature deliberation and without any undue influence on the part of any one.' There was ample evidence to sustain this finding also, and hence it would probably be sufficient to say that it should be approved, because 'The findings of a chancellor (as the hearing judge is in such cases, if approved by the court in banc) are entitled to the weight of a jury's verdict,

and, where supported by evidence, though in dispute, are controlling in the appellate court; and this is particularly so where (as here) the case depends on the testimony of witnesses, whose credibility must be weighed and passed upon' (Crick v. Paull, 287 Pa. 431; Phillips's Est., 244 Pa. 35, 47; Ligo v. Dodson, 301 Pa. 124, 130); especially if, also as here, the hearing judge saw and heard the witnesses, who testified for and against the views of the respective parties: Phillips's Est., 295 Pa. 349; Robb v. Stone, 296 Pa. 482; Karber v. Goldstrohm, 305 Pa. 470."

In *Mohler's Estate,* 343 Pa. 299, 22 A. 2d 680, the decedent was an elderly woman who made and signed a will at some time after she had been judicially declared a weak-minded person, and by which she gave her residuary estate to an employee of her legal guardian. After her death, it was contested by the beneficiaries of an earlier will, made prior to the period of her legal incompetency. In the Orphans' Court, the burden of proof of her testamentary capacity and of her freedom from undue influence was properly imposed upon the proponent. The evidence was in conflict. For example, the contestants produced the testimony of several physicians, which indicated that the testatrix had lacked the capacity to make a will. Nevertheless, the Chancellor found as facts, in an opinion affirmed by the Orphans' Court en banc, that the testatrix had been mentally capable, and that the alleged will was valid; and refused an issue d.v.n. On appeal, this Court affirmed, saying (MAXEY, J., p. 305):

". . . This burden the proponent of the will met to the satisfaction of the court below. That court declared that if an issue was awarded 'a verdict against the validity of the will could not be allowed to stand'. *This court has often said that 'in cases of this character, the findings of the chancellor supported by the court in banc must be considered just as binding on appellate courts as the verdict of a jury.* Of course, if there is no

evidence to support them or if it appears from the record that there is a capricious disbelief of evidence then the findings are worthless': *Pusey's Estate,* 321 Pa. 248, 184 A. 844." (Former italics added.)

*Pusey's Estate,* 321 Pa. 248, 184 A. 844, differed from the two cases just cited, in that the appellants failed to request an issue d.v.n. until after the hearing Judge had entered a decision against them, holding that the testator in the alleged will (of which they were proponents) had lacked testamentary capacity and had been the victim of fraud and undue influence. In this Court, they urged, nevertheless, that the Orphans' Court had been bound to grant an issue. This Court affirmed the Orphans' Court, saying (KEPHART, J., p. 260):

"At the outset of this case we are confronted by a rule of this court which has the effect of a rule of law. *We will not retry this case.* The question for us to consider is, first, whether there is evidence to support the findings of fact and whether the findings of fact support the decree. The court below and the court in banc made a thorough review of all the evidence and arrived at certain findings. If the evidence supports the findings and the findings in turn justify the decree, the decree will not be set aside: *Kahle's Est.,* 307 Pa. 212; *Phila. & Reading C. & I. Co. v. Directors of the Poor,* 311 Pa. 236; *Dible's Est.,* 316 Pa. 553; *Taylor's Est.,* 316 Pa. 557; *Lowe's Est.,* 318 Pa. 497."

(p. 261):

"*It must be thoroughly understood that, in cases of this character, the findings of the chancellor supported by the court in banc must be considered just as binding on appellate courts as the verdict of a jury.*"

(p. 267):

"It is argued that the court should have awarded an issue and it was in error in stating it had no power to award one. The matter is governed by the Act of June 7, 1917, P. L. 363, section 21(a) and (b). The court had

power to award an issue if it were expedient to do so. See *Cross's Est.,* 278 Pa. 170. In denying itself this power the court committed no error prejudicial to appellants. Counsel had opportunity to request that an issue be awarded if it desired one. *If the court had refused an issue d.v.n., the question for us would have been limited to determining whether this was an abuse of discretion* [italics added]. See *Dible's Est.,* 316 Pa. 553; *In re Doster's Est.,* 271 Pa. 68; *In re Mark's Est.,* 298 Pa. 285; *In re Fink's Est.,* 310 Pa. 453."

This Court will reverse a decision refusing an issue d.v.n. only if it appears that the chancellor has been guilty of an abuse of judicial discretion.

Judge MILHOLLAND's findings of fact are conclusive in this Court, if they be supported by substantial evidence—the effect of the presence of *conflicting evidence* will shortly be considered. Under a closely related rule, this Court treats with equal respect the conclusions of the Chancellor from the evidence; and will reverse a decision denying an issue d.v.n. only if it appears that the Chancellor has committed an abuse of judicial discretion, by capricious refusal to pay attention to the evidence, by the application of some improper conception of the law, or in some other recognized way.

In *Noble's Estate,* 338 Pa. 490, 13 A. 2d 422, an elderly, retired widower made a will, shortly before his death, by which he gave his residuary estate to a young man, not a relative, who probably stood in a confidential relationship to him and who was scrivener of the will. The will was contested on the grounds of lack of testamentary capacity and undue influence. The Chancellor refused an issue d.v.n. On appeal, this Court said (LINN, J., p. 491-492):

"This is not a common law action. In *Tetlow's Estate,* 269 Pa. 486, 494, 112 A. 758, we said: 'It is the established law of Pennsylvania that, in cases of the character of the one now before us, the judge is vested with power to decide whether or not he shall submit

oral evidence to the jury, even though it be conflicting.'
. . . In *Dible's Estate,* 316 Pa. 553, 554, 175 A. 538,
the rule was stated to be: 'We have repeatedly held that
in reviewing a chancellor's refusal of an issue devisavit
vel non the question for the appellate court to decide is
not whether it would have reached the same result had
it been acting as chancellor, but rather whether a judi-
cial mind, on due consideration of the evidence as a
whole, could reasonably have reached the conclusion of
the chancellor: *Tetlow's Est.,* 269 Pa. 486; *Fink's Est.,*
310 Pa. 453. As we said in Tetlow's Estate, "When the
answer to this question is in the affirmative, the judg-
ment appealed from will not be disturbed." *In other
words, the chancellor's decision will not be reversed un-
less an abuse of discretion on his part appears* [Italics
added] : *Doster's Est.,* 271 Pa. 68; *Mark's Est.,* 298 Pa.
285; *Fink's Est.,* supra.' "

The same rule is stated in similar language in nu-
merous other cases. Among them: *Morris Will,* 349 Pa.
387, 37 A. 2d 506 (PATTERSON, J.) : *Kish v. Bakaysa,*
330 Pa. 533, 199 A. 321 (DREW, J.) ; *Pusey's Estate,* 321
Pa. 248, 184 A. 844 (KEPHART, J.) ; *Fink's Estate,* 310
Pa. 453, 165 A. 832 (FRAZER, J.) ; *Mark's Estate,* 298 Pa.
285, 148 A. 297 (FRAZER, J.) ; *Doster's Estate,* 271 Pa.
68, 113 A. 831 (KEPHART, J.).

The existence of conflicts in the evidence, even on
controlling issues, does not create such a substantial
dispute as requires that an issue d.v.n. be granted.

It has been observed that, although Mr. Lare now
contends that this case presented a "substantial dis-
pute", such as would require the granting of an issue
d.v.n., there is really no conflict or dispute about the
evidence which supports the controlling findings of fact
and the controlling conclusions of the Chancellor. Mr.
Lare can point to no fact of controlling importance, ex-
cept the fact that the signature on the alleged will is
probably the handwriting of Mrs. Lare—which is true,
with the qualification that it must have been written in

1940, or almost two years before the date which appears on the instrument.[1]

This absence of any real conflict of evidence on any really important point of fact in the case is, however, not of any great legal importance on this appeal; for even if conflict of evidence did exist here, the decision of the court below would still be affirmed, in the absence of an abuse of discretion on the part of that court. The existence of conflicts in the evidence does not create a "substantial dispute", unless the Chancellor finds—or unless a conscientious Judge would be bound to find— that the credible evidence is so evenly distributed between the adverse parties that he would be obliged to approve a verdict for either party. In other words, if the Chancellor finds no difficulty in determining what evidence is credible and what is not, and therefore encounters no difficulty in finding the essential facts, he is bound to refuse an issue. This is the rule in *Caughey v. Bridenbaugh*, 208 Pa. 414, 57 A. 821, and in *Phillips Estate,* supra, two cases which have been cited in countless later decisions, and which will be mentioned again in this opinion.

Before discussing the cases in which serious conflicts of evidence have been presented, it should be pointed out that there is an important distinction between the status of an alleged will in a forgery contest and that of a document, genuinely executed, but attacked on other grounds. It is this: that if the signature and physical integrity of a will are not in dispute, those facts alone raise a strong presumption that the will is valid; whereas, in contrast, there is no presumption in a forgery contest that the alleged will is genuine.

---

[1] In *Phillips Estate*, 244 Pa. 35, 90 A. 457, a leading case, this Court said (Moschzisker, J., p. 42): ". . . The 'absolute right of the parties' to a trial by jury depends upon 'the strength of their evidence,' and to determine that, on an application for an issue, the Orphans' Court must hear and weigh the proofs as a whole."

In *Cressman Estate*, 346 Pa. 400, 31 A. 2d 109, a widower, almost eighty years old, made a will about a month before his second marriage, by which he gave a small portion of his estate to his fiancee and the rest to the children of his first marriage. A year later, on his deathbed—and less than a month before his death—he made a new will by which he gave substantially the entire estate to the second wife. It was written by an attorney, in the testator's bedroom, in the presence of the second wife and no other person. The will was executed later by witnesses whom she had procured for the purpose. Less than four weeks later, the testator died. The alleged will was contested on the grounds that he had lacked testamentary capacity and had been subject to undue influence. The Orphans' Court disbelieved evidence offered to show the exercise of undue influence, sustained the will and refused an issue d.v.n. This Court affirmed, saying (MAXEY, J., p. 404): ". . . 'Where a will was properly executed in every particular, a presumption of testamentary capacity and lack of undue influence arises, compelling evidence to upset the will . . .' "—and holding that it requires clear and substantial proof, in contests charging lack of testamentary capacity or undue influence, to meet and overcome this presumption.

Because of this presumption, the fact that a will is admittedly the act of the testator—that it is not a forgery, is nearly always (but not invariably) sufficient to entitle its proponents to an issue at least, if not to an Orphans' Court decree sustaining it without any trial by jury. But there is no such presumption where the issue is forgery. In other words, there is no presumption that the instrument involved here is the genuine act of Mrs. Lare. The burden of proving its genuineness rested upon the proponent, Mr. Lare, at the beginning of the hearing in the Orphans' Court; and, for the same reason, his right to call upon this Court to award him an issue must depend wholly on the strength

of the case he presented in the court below, under all of the evidence: he has no presumption to support him, as he would were the contest based on the other grounds.

In *Lowe's Estate,* which has been cited above, this Court said (SIMPSON, J., p. 502):

" 'In a will contest the judge sits as a chancellor, and must consider all the evidence; and the question is not whether a part of the evidence, standing alone, would support a certain verdict, but whether it would if considered as a whole. *The right to an issue under the statute, depends upon whether there is a substantial dispute upon a material matter of fact, and, unless there is, the proponent is no more entitled to an issue on the question of forgery than is the contestant on a question of testamentary capacity.* The statute does not confine the dispute to any particular question': *Fleming's Est.,* 265 Pa. 399. (Italics added.)

"In such cases a chancellor 'cannot permit a jury to do what he, as a chancellor, would not do': *Central Trust Co. v. Boyer,* 308 Pa. 402." The language italicized appeared originally in *Fleming's Estate,* 265 Pa. 399, 109 A. 265. It was quoted also in *Wägner's Estate,* 289 Pa. 361, 137 A. 616, (SADLER, J.).

Contestants have cited in their brief three of the four decisions in which this Court has passed upon the precise question presented here: where, that is, an Orphans' Court has denounced a will as a forgery and refused the request of its proponent for an issue d.v.n.; and the proponent has appealed. These three cases are: *Kane's Estate,* 312 Pa. 531, 168 A. 681; *Fleming's Estate,* supra; *McAndrew's Estate,* 206 Pa. 366, 55 A. 1040. The fourth such case is *Culbertson's Estate,* 301 Pa. 438, 152 A. 540, which will shortly be discussed.

In all of these cases, the decision of the Orphans' Court was affirmed. And, what is important here, the evidence in all four cases created disputes of fact of considerably more difficulty and legal substance than any which appear in this case.

Thus, in *Kane's Estate,* supra, the signature on the alleged will was admitted. The genuineness of the document established by the testimony of two subscribing witnesses, by expert testimony, by the testimony of the alleged scrivener, and by unquestioned evidence that the testatrix—a widow without close relative—had been on the most intimate terms with the principal beneficiary. Probate of the alleged instrument was, however, set aside and proponent's request for an issue denied, because there was physical evidence—which the chancellor accepted, although its effect was disputed—that the original first page of the two-page typewritten instrument had been removed, and another page substituted for it; and—more particularly, because there was strong evidence that the proponent had indulged in acts of suppression and fabrication of evidence.[2]

In spite of the substantial conflicts in the evidence, and although the proponents were able to explain the suspicious circumstances to an extent far greater than Mr. Lare has been able to explain those of this case, this Court affirmed the Chancellor's decision, holding the document a forgery and refusing its proponent an issue.

*Kane's Estate,* supra, settled the principle relied upon by the court below in this case: that even the presence of an admittedly genuine signature on an alleged will is insufficient to justify or require that an

---

[2] In *Brennan's Estate,* 312 Pa. 335, 168 A. 25, the alleged will was made by an elderly woman who had been judicially declared insane. It was contested on the grounds of lack of testamentary capacity. The contestant's request for an issue d. v. n. was denied; and this Court affirmed. It appeared that the contestant had made some efforts to forge a will, and to buy favorable testimony. This Court said (KEPHART, J., p. 342): ". . . This evidence was not impeached on cross-examination, and was denied by appellant only. It is scarcely necessary to comment on the effect of this testimony on contestant's credibility as well as on the good faith of this proceeding. Such conduct may entirely destroy what might otherwise be a strong case."

issue be granted, if the contestants offer circumstantial evidence sufficient to satisfy the conscience of the Chancellor that the instrument—considered as a whole—is a forgery.

In *Fleming's Estate,* supra, it was the signature which was held bad; but the case settled the underlying principle; that circumstantial evidence of forgery may justify the refusal of an issue, even though the facts be genuinely contested in the evidence. The genuineness of the signature of the alleged will was verified by the testimony of one subscribing witness; by the relatives of two other subscribing witnesses; by that of a recognized expert; and by that of a large number of highly respectable people—bankers, lawyers and businessmen. However, circumstantial evidence showed that the document was a forgery: the signature was an exact duplicate and evidently a tracing from the testator's genuine signature on a receipt which was in evidence; and the proponents' alleged discovery of the will and their conduct of the matter (like those of Mr. Lare) were peculiar and suspicious. The Orphans' Court rejected the evidence in favor of the alleged will; held it a forgery; and refused proponents' request for an issue. This Court affirmed.

In *McAndrew's Estate* supra, the situation was very much the same. The genuineness of the signature of the alleged will was attested by a subscribing witness, and supported by other testimony concerning the preparation, custody and discovery of the paper. However, the conduct of the proponent was suspicious; his credibility was impeached; and it was shown that the subscribing witness, although an honest woman, had not known the decedent, and that the account of the discovery of the will was improbable. The Orphans' Court refused proponent's request for an issue; and this Court affirmed.

In *Culbertson's Estate,* supra, the same rule was applied, although the complexity of the facts may obscure

its part in the decision. Testatrix was an elderly widow, who was survived by a number of children. Sometime after her death, two of her sons—Augustus and James— produced and secured probate of a paper which appeared to be her will, signed by her mark, and to bequeath the larger part of her large estate to James. Twelve years later, a fight between the brothers ended when both were taken to the police station; where Augustus declared that the will was a forgery, which he had manufactured in conspiracy with James.

This led to a contest between James, as proponent of the paper, and his brothers and sisters as contestants. In the Orphans' Court, Augustus repeated his assertion —or confession—that he had written the will in his own hand and forged the signatures of the subscribing witnesses, after his mother's death, at James' instigation. James contradicted this; and offered lay and expert evidence of genuineness. So far, the case required— principally—a choice between the testimony of a self-confessed forger and that of an apparently honest man; but the circumstantial evidence favored a conclusion of forgery. James' account of the discovery of the will was suspicious—it was almost exactly like Mr. Lare's account of the discovery of the alleged will here; and the Culbertson will, if genuine and properly dated, had appointed as executor a twelve-year-old-boy. The Chancellor (GEST, J.) held the paper a forgery, set the will aside, and refused proponent's request for an issue; and the appeal to this Court followed.

Then the case took a turn which shows the importance and weight of the rule concerning circumstantial evidence, established in *Fleming's Estate*. While the appeal was pending, the proponent, James, obtained leave to reopen the hearing in the Orphans' Court; and at the reopened hearing offered the testimony of a respectable lawyer that, although he had no recollection of its preparation or final disposition, the body of the alleged will was in his handwriting. This testimony, which the

Chancellor did not doubt, showed that Augustus' claim of his authorship or forgery of the paper—the only *direct* evidence of its forgery—must be false in large part. In spite of that, the circumstantial evidence of forgery, though much less forceful or conclusive than that available here, was still sufficient to convince the Chancellor. The Orphans' Court accordingly reaffirmed its original decision refusing an issue; and this Court affirmed that decision, saying (SADLER, J., p. 443) :

"The parties were personally heard by Judge GEST, and his findings of fact, attesting the truth of the statements heretofore set forth, approved by the court in banc, fully cover the contentions raised by the respective parties. It is needless, in passing upon the merits of the case, to refer to the unbroken line of authorities which hold that the facts as determined by the orphans' court are conclusive upon us where based upon sufficient evidence, and an examination of the record shows those made here to have been fully justified."

In each of these four forgery cases, the Chancellor was required to decide bitterly contested issues of fact, from evidence containing conflicts far more substantial and difficult—and much less one-sided—than those presented by this record. In each of the four, the Chancellor was, nevertheless, convinced by the evidence that no verdict of genuineness could be a true verdict, and being so convinced he rejected the proponent's evidence, refused proponent an issue, and set aside the alleged will. This method of treating such cases simply applied the rule in *Caughey v. Bridenbaugh,* supra, and *Phillips Estate,* supra; and, when we affirmed the Orphans' Courts, in all four cases, this Court simply applied that rule, and the related rules which have been discussed.

*DeLaurentiis' Estate,* 323 Pa. 70, 186 A. 359, cited by the majority, in no way conflicts with the views I have here expressed. There the court below refused an issue and we reversed on the ground that there was a breach of judicial discretion, because the evidence showed

that no Chancellor conscientiously could have found that there was not a substantial dispute. Here, however, the manifest weight of the evidence clearly shows that the purported will is a forgery and the Chancellor properly so found. No judicial mind, in my judgment, could have reached any other conclusion. His findings are overwhelmingly supported by the evidence and therefore should be binding on this Court.

There is nothing in our cases which cast any doubt upon the two rules of law I have defined and illustrated; first, that a Chancellor is required to grant an issue d.v.n. only if after a conscientious study of the evidence as a whole he is not certain of the truth of matters in controversy; and that he can and should refuse an issue and decide the case, if the evidence, considered as a whole, has convinced him that one side of the case is right and the other wrong; and, secondly, the rule that this Court will not, in such a case as this, overrule or reject any finding or conclusion of fact, or reverse any decree, which has been based by an Orphans' Court Judge upon a conscionable, lawful appraisal of the competent evidence.

In this case, there is no substantial conflict or dispute about the evidence required to sustain Judge MILHOLLAND's essential findings that the signature on the alleged will was not written in January, 1942; that the typewriting cannot have been the work of Mrs. Lare; and that the physical characteristics of the paper and the other relevant circumstances, shown by the evidence, all indicate that the document is a forgery.

Since such findings of fact will not be reviewed in this Court, and since in law they justify the refusal of an issue d.v.n. the decree of the Orphans' Court should be affirmed.