MARCELLUS R. LARE, JR., AND LILLIAN D. LARE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4830–72. Filed August 29, 1974.

*Frank F. Troup, I. C. Bloom,* and *Leonard Boreman,* for the petitioners.

*Joseph M. Abele,* for the respondent.

DAWSON, *Judge:* Respondent determined a deficiency of $39,814.73 in the petitioners' Federal income tax for the year 1968.

Respondent has made various concessions relating to income adjustments and additions to basis which affect the computation of gain from the sale of United Pocahontas Coal Co. stock. These concessions will be reflected in the Rule 155 computation. The following issues remain for our decision: (1) Whether petitioner Marcellus R. Lare, Jr., was the owner of 708 shares of United Pocahontas Coal Co. stock sold in 1968 so that he is taxable on the gain realized from such sale; (2) whether capital expenditures to obtain the assets of the Estate of Gertrude K. Lare must be allocated among the United Pocahontas Coal Co. stock distributed in 1968 and the other two stocks distributed in 1971; (3) whether the petitioner is entitled to any addition to the basis of the United Pocahontas Coal Co. stock and two other stocks for a settlement payment of $73,650 to will contestants; and (4) whether the petitioner is entitled to any additions to the basis of United Pocahontas Coal Co. stock and other stocks for legal fees, expenses, interest, and miscellaneous items.

FINDINGS OF FACT

Many of the facts have been stipulated by the parties. The stipulation of facts and the exhibits attached thereto as well as the supplemental stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Marcellus R. Lare, Jr. (herein called petitioner), and Lillian D. Lare were legal residents of McMurray, Pa., when they filed their petition in this proceeding. They filed their joint Federal income tax return for the taxable year 1968 with the district director of internal revenue at Pittsburgh, Pa.

### Litigation Involving the Estate of Gertrude K. Lare

Gertrude K. Lare, petitioner's first wife, died on June 25, 1942, a resident of Allegheny County, Pa. On June 29, 1942, letters of administration were granted to petitioner. Three days later he discovered his wife's purported will which had been written on the face of a blank check. On July 31, 1942, the purported will was offered for probate and letters of administration cum testamento annexo were granted by the Register of Wills for Allegheny County, Pa.

Gertrude Lare's two brothers and sister appealed to the Orphans' Court of Allegheny County on November 27, 1942, alleging that the will was in fact a forgery. They petitioned for the award of an issue devisavit vel non as well as for the revocation of the letters of administration previously granted to petitioner.

A trial before Judge Milholland of the Orphans' Court with respect to this issue lasted approximately 2 weeks. At the conclusion of that

proceeding the will was declared to be a forgery. Exceptions were taken by the petitioner to Judge Milholland's determination. On December 30, 1943, the Orphans' Court, sitting en banc, upheld the revocation of the letters of administration previously granted to petitioner.

On January 6, 1944, letters of administration de bonis non in the Estate of Gertrude K. Lare were issued to the Fidelity Trust Co. of Pittsburgh, Pa. The Pittsburgh National Bank, Fifth Avenue and Wood Street, Pittsburgh, Pa., is the successor bank to the Fidelity Trust Co. (hereinafter referred to as the bank).

Petitioner, who was represented by Bresci R. P. Leonard, appealed the Orphans' Court decree nisi to the Supreme Court of Pennsylvania. On May 21, 1945, that court reversed the decree of the Orphans' Court insofar as it refused an issue devisavit vel non. The portion of the Orphans' Court decree that removed the petitioner as administrator c.t.a. was not disturbed. This opinion is reported as *In re Lare's Estate*, 352 Pa. 323, 42 A.2d 801 (1945).

In response to a citation sought by the bank the petitioner filed an account of his administration of the estate on March 3, 1944. On June 3, 1944, Judge Trimble filed his opinion in that proceeding. His decision was appealed to the Orphans' Court en banc and later to the Supreme Court of Pennsylvania on September 14, 1944. It remained there until March 22, 1961, when an order of nolle pros was entered.

After the filing of the inventory and accounting, the petitioner was surcharged over $9,000. The bank was at that time entitled, as administrator of the Estate of Gertrude K. Lare, to assets valued at approximately $75,000 including the surcharge. The surcharge was not paid, but it was agreed that it would be charged against petitioner's ultimate share as an advance in distribution.

On December 2, 1949, the bank filed its First and Partial Account. Petitioner filed his objections to this account. These objections were principally with respect to items of credit taken by the bank as its compensation and to the awarding of counsel fees. The Orphans' Court approved the First and Partial Account which claimed compensation in the amount of $3,919.06 representing 5 percent of the gross estate valued at $78,381.22. The account also claimed a credit of 5 percent of the $90,354.67 income collected during the period. Counsel fees of $12,500 were also claimed.

On appeal the Supreme Court of Pennsylvania decided the correctness of the commissions taken on the income received as well as the counsel fees. The compensation claimed on the undistributed principal of the estate was disallowed as being a premature claim until a final accounting was rendered by the administrator.

The bank filed a Second and Partial Account covering the period from the time of its first accounting up to October 28, 1958. Petitioner

objected to his account; however, the objections were never argued and were withdrawn in January 1963 upon a joint petition of the parties. The bank filed a Final Account covering its administration to February 26, 1964, which was later supplemented to April 13, 1964.

In January 1964 a settlement of the will contest originally filed by Gertrude Lare's two brothers and sister on November 27, 1942, was reached. Petitioner and the contestants signed a mutual release on January 17, 1964, which provides as follows:

Now THEREFORE, for and in consideration of the payment of one dollar ($1.00) each to the other in hand paid at and before the signing and delivery hereof, together with other good and valuable consideration, receipt whereof is hereby acknowledged, each party hereto does hereby remise, release and forever discharge each other party, his heirs, personal representatives, successors and assigns, and the Estate of Carl E. Maratta and the Estate of Paul E. Maratta, of and from all claims, debts, rights, benefits and causes of action whatsoever arising out of or by reason of the subject matter of the above-mentioned actions or the death of Gertrude K. Lare, Deceased.

The will contestants received the sum of $73,650 in settlement of their claims against the estate. This amount was obtained by the petitioner by means of a disbursement of $75,000 from the estate pursuant to an order entered by the Orphans' Court on January 15, 1964. In form the bank issued its check for $75,000 to the petitioner who endorsed it and returned it to the bank. The bank then distributed $73,650 to the contestants and $1,350 to the petitioner by means of two cashier's checks.

Following the settlement of the will contest the petitioner was the sole beneficiary of the Estate of Gertrude K. Lare.

On April 3, 1964, the petitioner filed his objections to the Second and Final Account filed by the bank. His principal objection concerned the obligation of the bank to invest the income it had collected over the years from the productive assets of the estate. The Orphans' Court dismissed petitioner's exceptions and confirmed the bank's Second and Final Account.

The Final Account showed that the bank had collected over $350,000 of income during the period of its administration. Dividends received with respect to the 708 shares of stock in United Pocahontas Coal Co. (hereinafter referred to as United Pocahontas) from December 1949 until December 1963 comprised the bulk of the income and totaled $277,536.

The First and Partial Account filed by the bank showed a cash disbursement of $2,500 to the petitioner on January 18, 1957. The bank also paid the petitioner $175 per month for 110 months from November 1, 1949, until December 1, 1958. Additional payments of income during this period totaled $95,111.50. From November 24, 1959,

until January 17, 1964, the bank made further distributions to the petitioner totaling $122,618.98.

After the approval of the Second and Final Account by the Orphans' Court, the petitioner appealed to the Supreme Court of Pennsylvania which found that the bank had breached its duty as a fiduciary by holding, in a non-interest-bearing account, substantial sums of money from July 1, 1944, until July 1, 1964. The bank was directed to pay reasonable interest not to exceed 6 percent for the loss suffered by petitioner for the failure of the bank to invest the cash it had held since its accounting in 1949. The full opinion of the Supreme Court of Pennsylvania is reported at 257 A.2d 556 (1969). The bank ultimately paid petitioner the sum of $90,000 in compromise of this claim under a settlement agreement entered into on February 12, 1971, and carried out on June 9, 1971. A claim for interest with respect to the settlement amount was made by petitioner at the hearing confirming the settlement. This claim was abandoned after consultation among the parties.

### Assets of the Estate

The First and Partial Account of the bank dated October 28, 1949, showed a gross estate of $168,735.89. The account carried the following stocks and bonds at a value of $51,001.94:

| Name | Shares | Assigned value |
|---|---|---|
| Stocks: | | |
| Book-Cadillac Properties, Inc. | 75 | 0 |
| Gibson & Co., Inc. | 375 | 0 |
| Hearst Consolidated Publications, Inc. | 17 | $88. 19 |
| Lear, Inc. | 943 | 1, 885. 75 |
| Osage Oil & Refining Co. | 3, 850 | 0 |
| Romeson Manufacturing Corp. | 1, 256 | 0 |
| Second National Bank of Connellsville, Pa. | 240 | 3, 000. 00 |
| United Pocahontas Coal Co. | 708 | 46, 020. 00 |
| Roosevelt Hotel, Inc. (units) | 10 | 5. 00 |
| Bonds: | | |
| Book-Cadillac Properties, Inc. (percent) | 5 | 3. 00 |
| Book-Cadillac Properties, Inc., fractional share of income | | 0 |

Seven other stocks and bonds were carried at either nominal or non-existent values.

On October 31, 1949, the bank increased the inventory value of the 708 shares of United Pocahontas from $50 to $65 per share to conform with the value used for Federal estate tax purposes.

On March 7, 1957, the bank charged off as worthless 375 shares of Gibson & Co. capital stock and 1,256 shares of Romeson Manufacturing Corp.

On October 29, 1958, the bank charged off as worthless 75 shares of Book-Cadillac Properties, Inc., a 5-percent Book-Cadillac Properties, Inc., bond due April 1, 1947, and a certificate for fractional interest in a Book-Cadillac Properties, Inc., bond.

On April 4, 1960, the bank charged off as worthless 3,850 shares of Osage Oil & Refining Co.

The 17 class A shares of Hearst Consolidated Publications, Inc., were called for redemption on December 15, 1964.

Between November 4, 1952, and February 16 1953, the Roosevelt Hotel, Inc., units were exchanged for Hilton Hotel Corp. common stock and sold.

The principal investment assets of the estate were the United Pocahontas Coal Co., Second National Bank of Connellsville, Pa., and Lear Siegler, Inc. These stocks produced regular dividend payments. United Pocahontas produced the bulk of the dividend income.

The bank filed a Supplement to Petition for Distribution (Second and Final Account) in which it showed claims against the estate of $74,258.45. At that time the estate possessed only $40,714.24 in cash; however, there was an outstanding offer to purchase the United Pocahontas stock for a total price of $283,200.

Attached to the supplement as an exhibit was a Stipulation and Agreement signed by petitioner which provided inter alia for the distribution of the 708 shares of United Pocahontas stock so that $33,544.21 of the proceeds from the sale would be returned to the estate in order to meet existing claims against the estate. After the sale of the United Pocahontas stock, the $33,544.21 was disbursed by the Mellon National Bank & Trust Co. to the bank.

In order to enable the bank to pay the liabilities owed by the estate at the time of the sale of the United Pocahontas stock the sum of $33,544.21 was withheld from the amount received by the petitioner and paid to the bank. To this was added the cash available to the estate ($40,714.24) so as to permit the payment of the following claims against the estate:

Unpaid fees to Reed, Smith, Shaw & McClay_____ $3,000.00
Compensation of bank as administrator_____ 16,000.00
Amount paid by administrator for legal fees to Reed,
    Smith, Shaw & McClay_____ 27,758.45
Harbaugh Miller, Esq.[1]_____ 27,500.00

[1] Respondent has conceded this payment to be properly added to the basis of the stocks held by the estate.

The agreement contemplated that the petitioner would accept the offer to purchase in his capacity as an individual shareholder and

would constitute distribution to him in his capacity as sole beneficiary of the estate.

By letter dated February 15, 1968, addressed to the bank, the petitioner stated:

Upon entry of a decree by the Orphans' Court of Allegheny County distributing to me the 708 shares of United Pocahontas Coal Company ("United") stock, I hereby authorize and direct that you deliver the certificate for such stock, properly endorsed in my favor, to the transfer agent of United for registration in my name and that you deliver the new certificate registered in my name to Mr. Alexander P. Reed, as Sellers' Agent under the Stock Purchase Agreement dated as of November 6, 1967, as amended, among United, National Bulk Carriers, Inc. and the stockholders of United.

A stipulation entered into on February 16, 1968, by the petitioner and the bank and confirmed by the Orphans' Court on February 23, 1968, notes that the 708 shares of United Pocahontas stock had been distributed to the petitioner.

A document acknowledging receipt of the 708 shares of United Pocahontas stock in partial distribution was signed by petitioner and filed with the Orphans' Court.

The trust department of the bank in its record of principal cash and investments shows an entry dated February 15, 1968, reading as follows: "United Pocahontas Cola [sic] Co CPA 708 SHS Delivered To Marcellus R Lare."

The disbursements column under *investments* reflects this reduction in investment assets (carried value) of $46,020 reducing the balance to $16,294.42.

Petitioner represented and warranted with respect to the 708 shares of United Pocahontas stock that he was (1) the lawful owner with (2) the right to sell the stock and that he was (3) selling all the United Pocahontas stock owned by him.

Petitioner at all times demanded that the assets of the estate held by the bank be returned to him in kind. The bank was aware of his wishes in this matter.

The total purchase price for the United Pocahontas stock was $3,500,000. Of this amount $250,000 was held in escrow. The escrowed sum was ultimately distributed pro rata on June 22, 1971.

Petitioner's share of the proceeds from the sale of the United Pocahontas stock totaled $263,147.72. This did not include the later distribution to him of an amount in excess of $20,000 from the escrow fund that was distributed on June 9, 1971. After retention of $33,544.21 by the bank, the petitioner received a net initial distribution of $229,603.51 upon the sale of the 708 shares of United Pocahontas stock. These moneys were promptly reinvested by the petitioner.

The $33,544.21 not received directly by the petitioner was paid to the bank as provided in the Decree of Distribution. On February 15, 1968, petitioner wrote the Mellon National Bank & Trust Co. as follows:

> I am the holder of 708 shares of common stock of United Pocahontas Coal Company ("United"), which I have agreed to sell * * *
>
> Intending to be legally bound, I hereby direct that, out of the Closing Purchase Price, you pay the sum of $33,544.21 to the Pittsburgh National Bank. * * *, and that you pay to me the balance * * *

A memorandum addressed to "Jack" [Plowman], the petitioner's attorney at that time, shows a total amount due petitioner of $263,147.72 less a payment of $33,544.21 to the bank.

Petitioner claimed a basis in the United Pocahontas stock of $196,464.33 on his joint Federal income tax return (Schedule D) for the year 1968.

The United Pocahontas stock had originally been valued at $50 per share. Following a review of the estate tax return filed in the Estate of Gertrude K. Lare, the petitioner, the bank, and the will contestants agreed to a revised value of $65 per share, or a total value of $46,020.

Respondent agrees that there should be added to the petitioner's basis in the three stocks the sum of $47,659.33, allocated as follows:[1]

|  | Percent |
|---|---|
| United Pocahontas Coal Co | 87.0 |
| Second National Bank of Connellsville | 8.3 |
| Lear Siegler, Inc | 4.7 |

The respondent has, in his opening brief, agreed that the following expenditures should properly be reflected in the adjusted basis of the stocks:

| Payee | Amount | Payee | Amount |
|---|---|---|---|
| William Powell | $646.00 | Albert D. Osborne | $500.00 |
| J. J. Bailey, Court Reporter | 34.00 | Brady Stewart | 30.00 |
| Do. | 22.50 | Edwin C. Leslie | 1,219.13 |
| Bresci Leonard, attorney | 10,000.00 | Frank Troup, attorney | 500.00 |
| McIntosh & Garrahan, attorneys | 1,900.00 | Miscellaneous items | 53.68 |
|  |  | Total | 14,905.31 |

Absent any allocation the respondent has conceded a basis of $108,584.64.

---

[1] The stipulation of facts states that the petitioners disagree with the allocation as made.

The following items of cost were claimed by the petitioner as additional elements of his basis in the United Pocahontas stock:

| Payee | Amount | Payee | Amount |
|---|---|---|---|
| Josiah Smith Co. | $272. 26 | Plowman & Spiegel, attorneys | $1, 000. 00 |
| Bresci Leonard, attorney | [1] 2, 500. 00 | Do | 478. 95 |
| Will contestants | 73, 650. 00 | Do | 256. 25 |
| Pittsburgh National Bank | 6, 044. 21 | Do | 1, 500. 00 |
| Mellon National Bank | 250. 00 | Do | 1, 500. 00 |
| Murrelle Printing Co. | 134. 82 | Bugnone & Swope | 24. 00 |
| Bloom & Bloom, attorneys | 250. 00 | Do | 16. 20 |
| Prothonotary of Supreme Court | 3. 00 | Total | 87, 879. 69 |

[1] This reflects the concession made by respondent.

Petitioner made a payment of $478.95 on September 20, 1966, to Jack Plowman, an attorney, upon receipt of a bill dated September 13, 1966. This involved claims made against the petitioner by Bresci R. P. Leonard, his former attorney, for counsel fees.

The amount of $256.25 was set forth in a bill to the petitioner dated November 28, 1966, from Jack Plowman for services rendered with respect to the claims of Bresci R. P. Leonard for counsel fees.

The dispute over the fees arose out of work performed by Mr. Leonard in an unsuccessful suit seeking to surcharge an attorney who had handled the estate of the petitioner's wife's first husband.

Petitioner successfully asserted a claim for an interest surcharge against the bank by virtue of the fiduciary obligation of the bank to invest the income received by the Estate of Gertrude K. Lare. This claim was settled by the payment of $90,000 to the petitioner by the bank. In conjunction with this claim the petitioner paid the firm of Plowman & Spiegel a total of $38,708.04.

The moneys paid to Bugnone & Swope in the amount of $24 and $16.20 on November 2, 1961, were for copies of a deposition of Bresci R. P. Leonard taken in connection with lawsuits by Mr. Leonard to recover legal fees from the petitioner.

Petitioner paid the Mellon National Bank Datacenter $250 to perform interest calculations in connection with the petitioner's successful surcharge action against the bank.

Petitioner paid the law firm of Bloom & Bloom the sum of $250 for assistance in the Supreme Court of Pennsylvania in a suit against the bank. The $3 was paid to the Prothonotary of the Supreme Court as a filing fee in this suit. The suit was primarily based on the petitioner's assertion that the bank had been improperly appointed as the adminis-

trator of his wife's estate. The suit asking for damages of $2,500,000 was dismissed by the Court of Common Pleas of Allegheny County, Pa., for lack of jurisdiction.

The sum $134.82 represents the summer discount given to the petitioner by the Murrelle Printing Co. and was not paid by the petitioner. The actual cost of printing done by the Murrelle Printing Co. was $1,562.68.

Petitioner paid the sum of $272.26 to the Josiah Smith Co. This was interest on an overdue printing bill of $5,225.35 which had been incurred in printing the paper book in the Gertrude K. Lare estate case before the Supreme Court of Pennsylvania. It was paid sometime in 1947 or 1948.

Petitioner sold a residence utilizing the services of the Union Title Guaranty Co. That company paid $2,500 to Bresci R. P. Leonard from the proceeds of the sale of the house. The money was to pay some of the costs incurred in prosecuting the appeal to the Supreme Court of Pennsylvania in the Gertrude K. Lare matter. The primary purpose and use of the money was to pay expenses incurred in such litigation. The money was kept in a special checking account opened November 1, 1945, with a $2,500 deposit. A single other deposit of $500 was made on August 15, 1946. The account was closed October 6, 1948. The following disbursements were made from the account:

| Check | Payee | Amount | Purpose |
|---|---|---|---|
| 1 | Marcellus R. Lare, Jr | $506.66 | Advances. |
| 2 | do | 100.00 | |
| 3 | Josiah Smith Co | 500.00 | Printing. |
| 4 | do | 500.00 | Do. |
| 5 | do | 225.35 | Do. |
| 6 | Perkins Detective Service | 200.00 | MLR, Jr. |
| 7 | do | 194.20 | Balance due. |
| 8 | Roosevelt Hotel, Inc | 2.50 | Items, letter July 11, 1946. |
| 9 | Josiah Smith Co | 500.00 | Printing. |
| 10 | City Bank Farmers Trust Co | 1.23 | Check copies. |
| 11 | Eugene O. Kane | 15.00 | Appointment fee. |
| 12 | D. E. Sweeney | 15.00 | Do. |
| 13 | Bresci Leonard | 20.00 | Repayment. |
| 14 | M. R. Lare, Jr | 20.00 | |
| 15 | Ralph E. Watson | 12.00 | Testimony. |
| 16 | Bresci Leonard | 50.00 | Refund advance made. |
| 17 | M. R. Lare | 50.00 | |
| 18 | M. R. Lare, Jr | 88.06 | Close account. |

The payments to Josiah Smith Co. totaling $1,725.35 were for printing expenses incurred in the proceedings before the Supreme Court of Pennsylvania. The total amount paid to the Josiah Smith Co. ($5,225.35) has been previously added to the basis.

The petitioner received $764.72 from the account in reimbursement.

The Perkins Detective Service was paid $394.20 for services rendered on behalf of the petitioner.

Bresci R. P. Leonard received $70, $50 of which was in repayment of advances.

Fees paid for testimony totaled $42, while $3.73 was paid for miscellaneous items.

### ULTIMATE FINDINGS

1. Petitioner was the owner of the 708 shares of United Pocahontas stock when they were sold on February 15, 1968, for $263,147.72.

2. Allowable expenditures made by the petitioner to acquire the assets of the Estate of Gertrude K. Lare must be allocated among all the stocks in the estate.

3. The payment of $73,650 made from the estate to three will contestants is not a proper addition to the basis of the United Pocahontas stock and the two other stocks.

4. Petitioner is not entitled to increase the basis of the United Pocahontas stock for other disputed expenditures.

### OPINION

Petitioner has advanced several arguments in his effort to establish the incorrectness of the respondent's determination. The arguments are in substantial part contradictory and not supported by the record. We will deal only with the most prominent ones.

## I. *Ownership of United Pocahontas Stock*

Petitioner's principal contention is that he was not the seller of the United Pocahontas stock on February 15, 1968, and thus it is in error to tax him on the proceeds of the sale. He asserts that he was only a "dummy" in the sale transaction. To the contrary, respondent contends that the petitioner had title to the stock on the date of sale.

Petitioner at all times maintained a staunch and unbending attitude in demanding the return of all estate assets in kind. On February 15, 1968, he received the first distribution of such assets in kind. On that day the Orphans' Court of Allegheny County, Pa., entered a decree of partial distribution for the 708 shares of United Pocahontas stock. A stipulation filed in the Orphans' Court on February 23, 1968, reiterated the fact that the stock was distributed to the petitioner. The stipulation tracked the sale chronology of the United Pocahontas stock from the bank to the petitioner to the sellers' agent, Mr. Alexander P. Reed, and thence to the distribution of the sale proceeds.

We think it is perfectly clear that the sale of this stock was made by the petitioner in his name and for his benefit in the year 1968. We find this as a fact notwithstanding the petitioner's assertion on brief that it was not his intention that he be given legal title to the stock. This is

belied when the petitioner gives as a reason for the distribution of the stock to him the fact that it was done to allow him to sell the stock.

Petitioner succeeded in receiving in kind exactly what was put into the estate so many years before—precisely what he always maintained he would do. He was no "dummy" to this transaction. In order to complete the sale of the stock the petitioner represented and warranted that he had valid and marketable title at the date of closing on February 15, 1968. His argument that he did not actually hold the stock certificates in his hands and thus did not obtain "delivery" is refuted by a letter dated February 15, 1968, to the bank signed by the petitioner, which provided in relevant part:

> Upon entry of a decree by the Orphans' Court of Allegheny County distributing to me the 708 shares of United Pocahontas Coal Company ("United") stock, I hereby authorize and direct that you deliver the certificate for such stock, properly endorsed in my favor, to the transfer agent of United for registration in my name and that you deliver the new certificate registered in my name to Mr. Alexander P. Reed, as Sellers' Agent under the Stock Purchase Agreement * * *.

The stock certificates were received by the petitioner in partial distribution of the estate and not as a technical advancement.[2]

Petitioner next contends that his 1968 Federal income tax return upon which he reported the sale of the United Pocahontas stock may not be viewed as binding on him. He argues that this is so because he did not give the certified public accountant who prepared the return a legal opinion as to the actual ownership of the stock. Alternatively, he asserts that the return was correct as filed. This presumably means that the petitioner feels his chosen basis and allocation methods are correct.

Statements made in a tax return signed by a taxpayer may be treated as admissions. See *Walter H. Kaltreider*, 28 T.C. 121 (1957), affd. 255 F. 2d 833 (C.A. 3, 1958). Similarly, the alternative argument advanced by the petitioner that the return as filed was correct is insufficient to overcome the presumption of correctness attaching to the respondent's determination. *Louis Halle*, 7 T.C. 245 (1946), affd. 175 F. 2d 500 (C.A. 2, 1949), certiorari denied 338 U.S. 949 (1950).

If the petitioner may fairly be said to be basing his alternative argument on the possible mistake in an instruction manual, we believe that to be unavailing. Respondent is not bound by either a mistake in an instruction manual or a possible misinterpretation thereof. Pe-

---

[2] *In re Houston's Estate*, 383 Pa. 466, 119 A.2d 304, 306 (1956), defines advancement as "an irrevocable gift by a parent in his lifetime to his child on account of the child's share of the estate, after the parent's decease."

The court pointed out that in a strict legal sense the term relates exclusively to cases involving intestacy but in a popular use it has referred to a situation where the decedent died testate. The use of the term has not, however, become so loose as to encompass petitioner's use.

titioner has not introduced any evidence that would show us what instructions he relied on. See *Wilber Nat. Bank* v. *United States*, 294 U.S. 120 (1935); *Sanders* v. *Commissioner*, 225 F. 2d 629 (C.A. 10, 1955).

In summary, it is our conclusion that the petitioner received and sold the 708 shares of United Pocahontas stock as the owner of the stock. The Orphans' Court contemplated that title to the United Pocahontas stock would pass to petitioner when the distribution was made to him. A decree of distribution, which authorized the distribution of such stock to him, was entered by the Orphans' Court. Petitioner admitted that he received title to the stock. His concerns about the return of the United Pocahontas stock to him and the documents executed by him show that he wanted to and did become the owner of the stock which was, in fact, issued in his name. And he sold the United Pocahontas stock on February 15, 1968, to National Bulk Carriers for $263,147.72.

## II. *Allocation of Capital Expenditures Among All Stocks*

The primary assets of the estate consisted of shares of stock in three corporations. It was stipulated that the following information correctly shows the fair market value of the stocks and the percentage of total value with respect to the estate:

| Company | FMV (Feb. 1968) | Percentage of total |
|---|---|---|
| Lear Siegler, Inc. | $15,125.50 | 4.7 |
| Second Natl. Bank of Connellsville | 27,000.00 | 8.3 |
| United Pocahontas Coal Co. | 283,200.00 | 87.0 |

The stipulation states that the petitioner[s] "disagree with the allocation method of computing the basis used by respondent." We assume that the petitioner also disagrees with the result such method of allocation produced.

Respondent argues that whatever capital expenditures were made by the petitioner were made "to acquire all the stocks in the estate." In addition, he argues that the petitioner had established his right to all the stocks in the estate and, consequently, all the stocks should bear the allocation of basis. Respondent's allocation was based on the ratio of the fair market value of each stock to the total fair market value in February 1968—the time of distribution.

Anticipating that the petitioner would argue that since the Lear Siegler and the Second National Bank of Connellsville stocks were not physically acquired until 1971 and that no allocation in 1968 would be appropriate as to them, the respondent asserts that *all* the assets were sought and all should be given an adjusted basis regardless of

when they were physically received. We agree with the respondent on this point. All the stocks were sought and received and all should be considered in allocating the basis.

Accordingly, we conclude that the capital expenditures incurred and paid in the petitioner's effort to establish his right to all the stocks in the Estate of Gertrude K. Lare should be allocated among all the stocks in proportion to their fair market value as determined by the respondent.

### III. *Additions to Basis of United Pocahontas Stock*

Petitioner initially claimed an adjusted basis of $196,464.33 in the United Pocahontas stock. This was comprised of the $46,020 basis plus $150,444.33 added costs. He subtracted this from the claimed gross price of $229,603.51 in order to arrive at his reported gain of $33,139.18.

Respondent initially determined the basis to be $46,020. A review resulted in other additions to basis totaling $47,659.33. Further review, reflected by concessions on brief, has added $14,905.31 more to the respondent's determination of adjusted basis.

With the petitioner claiming an adjusted basis of $196,464.33 and the respondent now conceding an adjusted basis of $108,584.64, the parties disagree as to the sum of $87,879.69 which is composed of the following items:

| | | | |
|---|---|---|---|
| Will contestants | $73,650.00 | Plowman & Spiegel | $1,500.00 |
| Josiah Smith | 272.26 | Do | 1,500.00 |
| Bresci Leonard account | 2,500.00 | Murrelle Printing Co | [1]134.82 |
| Pittsburgh National Bank | 6,044.21 | Bloom & Bloom | 250.00 |
| Mellon National Bank | 250.00 | Prothonotary fee | 3.00 |
| Plowman & Spiegel | 1,000.00 | Bugnone & Swope | 24.00 |
| Do | 478.95 | Do | 16.20 |
| Do | 256.25 | | |

[1] Due to a computation error the respondent shows this to be $134.87.

These disputed additions to the basis of the stocks are discussed below.

A. *Payments to will contestants.*—Petitioner was named as the sole heir in his wife's will, which was admitted to probate in 1942. However, a will contest developed soon thereafter which was not resolved until 1964. In that year the petitioner worked out an agreement with the three will contestants to pay them a total of $73,650.

The funds required to pay the agreed sum to the will contestants were received directly from the Estate of Gertrude K. Lare. The bank issued a check for $75,000 to the petitioner pursuant to an order entered by the Orphans' Court on January 15, 1964. The Orphans' Court had approved the settlement. The check for $75,000 made payable to the petitioner was endorsed by him and then returned to the bank. The

bank thereupon distributed $73,650 to the contestants and $1,350 to the petitioner.

It is the petitioner's contention that he received the $75,000 from the estate. He then carried out the agreement he had personally reached with the will contestants. Thus, he asserts that the moneys used to pay the contestants were his own and not those of the estate.

The moneys were derived from accumulated income in the estate to which the petitioner was entitled either as sole legatee under the will or as a distributee under intestate succession if the will had been found invalid. With the settlement of the will contest the petitioner was left as the sole legatee of the estate. As such, all assets of the estate were to be distributed to him eventually. The $75,000 was paid to petitioner from the accumulated income of the estate and was at least equal to that which he would have been entitled had the will been declared invalid. Petitioner also argues that it would be inconsistent to treat him as the owner of the United Pocahontas stock when it was distributed and sold and taxed to him when received and to refuse to recognize him as the owner of the $75,000 when it was distributed to him and subsequently disbursed to the will contestants.

Respondent takes the position that the moneys came from the estate to pay the will contestants and not "from moneys in Mr. Lare's pocket." In support of this position he relies primarily upon *Clara A. McKee*, 19 B.T.A. 430 (1930). In the *McKee* case the decedent had executed a will in 1918 making a sizable bequest to a niece. Less than 1 year later he wrote a will in which he left his entire estate to his wife. Subsequently the holographic will was admitted to probate. Shortly thereafter the niece expressed her intention to contest the validity of the will on the grounds of mental incapacity and undue influence with respect to the decedent. Evidence of such was obtained by the niece's attorneys. After prolonged negotiations prior to any litigation, the parties were able to reach a compromise. It was agreed that the niece would be paid $225,000 in complete settlement of any and all claims she had or might have against the estate. The petitioner in her capacity as administratrix drew two checks in the total amount of $232,304.86 made payable to herself. She endorsed and deposited them in her personal account and then wrote a check to the order of "Reed, Smith, Shaw & Beal, Attys for Agnes Morrison Holmes."

If the case had been tried and the holographic will ultimately rejected, the niece would have been entitled under the intestate laws in Pennsylvania, then applicable to one-half of the estate, to an amount substantially greater than the settlement figure.

The taxpayer in the *McKee* case advanced alternative contentions. First, she treated the amount paid as an ordinary and necessary ex-

pense of her business as an "owner and manager of property." Alternatively, she asserted that the amount was a capital outlay made in perfecting title to property and should be added to the cost of the property acquired.

On these facts the Board of Tax Appeals held against the petitioner on grounds different from those advanced by either party. Apparently the Commissioner had disallowed the *deduction* on the ground that it was a personal expense. The Board at page 432 of its opinion said it did not believe "that the amount of $225,000 constituted an *expense* of any kind, either business or personal; nor do we believe that it was a capital expenditure, or that petitioner acquired any property by the transaction." (Emphasis in original.) The Board concluded that it was only a relinquishment of part of what the petitioner believed had come to her under the will of her husband. This enabled her to secure clear title to that which did come to her.

The petitioner in this case seeks to distinguish *McKee* on several grounds. First, he stresses that there was no order of the court confirming the distribution to Mrs. McKee and, considering the identity of the parties, the transaction was without substance. Second, he says that the will contestants in *McKee* received almost the same amount in settlement that they would have received under operation of law. And, third, he points out that the petitioner in *McKee* did not acquire any property by the transaction.

The facts in *McKee* do not make clear what the assets of the estate were. Obviously, if the only asset was cash, the Board would have been unable to ascribe an additional basis to it. By contrast, the property received in the instant case was stock, the cost basis of which ought to include all elements of cost properly attributable to it. Hence the *McKee* case may be distinguishable on its facts. However, both *McKee* and this case seem to be consistent on a broader ground, i.e., in such situations the will contestants are considered to receive their payments from the estate and the legatee serves merely as a conduit for such payments.

There are several cases involving payments to will contestants, and almost all concern whether such payments are considered received by inheritance for purposes of section 102 and its predecessors. In *Lyeth* v. *Hoey*, 305 U.S. 188 (1938), the Supreme Court held that where the contestants receive their payments from the estate, they receive them by inheritance for purposes of that statute. In *Quigley* v. *Commissioner*, 143 F. 2d 27 (C.A. 7, 1944), the Court of Appeals concluded that a compromise payment to a will contestant made by a legatee is also considered received by inheritance. However, in *Lydia Hopkins*, 13 T.C. 952, 969 (1949), the Tax Court held that a payment

to a will contestant by a legatee from the legatee's *separate* property was not received by the contestant through inheritance; but we distinguished the *Quigley* case on the ground that there the contestant received the payment, either directly or indirectly, from property belonging to the estate. Thus the *McKee* case is in harmony with *Hopkins*.

We agree with the respondent that the petitioner is not entitled to additional basis in the stocks for the $73,650 paid to the will contestants because they received a share in the estate to which they were making a claim. The payment to the will contestants from moneys in the estate does not constitute a capital expenditure for petitioner. Neither the facts nor the law supports petitioner's position that *he* paid $73,650 to the will contestants in order to procure title to all the stocks in the estate. The will contestants were simply paid a share of the estate from the estate. And, as we see it, the petitioner should not receive credit for the distribution from the estate which went to pay the will contestants.

Accordingly, we hold that the $73,650 paid to the will contestants from the moneys of the estate does not constitute any addition to petitioner's basis in the United Pocahontas stock and the other two stocks.

B. *Josiah Smith.*—This involves $272.26 paid as interest incurred for delayed payment of printing bills. The principal amounts of these bills have been added to the basis of the stocks held by the estate. This interest was paid in 1947 or 1948. Thus it appears that the item was deductible in the year paid. See sec. 23(b), I.R.C. 1939.

Section 1016(a), I.R.C. 1954, provides that adjustments with respect to the basis of property shall be made. This is done so that a proper figure representing the amount realized, if any, on disposition of the property may be determined. Section 1.1016–2(a), Income Tax Regs., provides that "No adjustment shall be made in respect of any item which, * * *, is treated as an item not properly chargeable to capital account but is allowable as a deduction in computing net or taxable income for the taxable year."

The interest item was allowable as a deduction in the year paid. No such deduction was taken when permitted, and therefore no addition to basis may be made for this item.

C. *Bresci Leonard account.*—No evidence was introduced with respect to this item of $2,500. The source of the money was the sale by petitioner of his residence. The money remaining was used for various items. Sums paid from this account to Josiah Smith Co. have been allowed as additions to basis. Clearly other items, such as reimbursement to the petitioner, cannot be, without more, added to basis. Our

findings of fact show where the money in this account went. What the petitioner has failed to establish, because no evidence was offered, is why the money was paid. Investigatory fees, just as legal fees, are proper additions to basis if such expenditures are shown. In the absence of evidence, we must agree with the respondent's determination. Consequently, this $2,500 cannot be added to the basis of the United Pocahontas stock.

D. *Pittsburgh National Bank.*—This amount ($6,044.21) was paid to the Pittsburgh National Bank as administrator in order to provide funds for paying the remaining debts of the Estate of Gertrude K. Lare. There was originally paid to the Pittsburgh National Bank the sum of $33,544.21. The legal fees of Harbaugh Miller in the amount of $27,500 has been allowed as an addition to the basis of the stocks received. The balance was paid to avoid the necessity for selling the Lear Siegler and the Second National Bank of Connellsville stocks.

In support of his position that a payment made to an estate in order that the payor will receive assets from the estate does not increase the basis of the assets, respondent cites *Florence W. Hunt*, 35 B.T.A. 1042 (1937), and *Augustus S. Loyless, et al.*, 1 T.C.M. 131 (1942).

Petitioner acknowledges that the cases cited by the respondent do support his position but asks us to disregard them as no longer being in accord with the principles permitting expenditures made to acquire property to be added to the basis of such property.

*Florence W. Hunt, supra*, involved the question as to whether or not the payment by a beneficiary of a valid debt of the estate will result in an increase in the basis of property received from the estate. The Board of Tax Appeals concluded that it did not because the debt was an obligation of the estate which the beneficiary was under no legal obligation to discharge. In *Hunt* the beneficiary made a "voluntary" payment of an obligation not her own in order to obtain securities having a value of $240,000 and to obtain the release of securities of her own with an equal value. The payment of the obligation was not a purchase of the securities she received. They were received by her in her capacity as a residuary legatee and their basis was their fair market value at the time of acquisition.

The $33,544.21 cash deficit in the estate was made up by the petitioner from part of the sale proceeds of the United Pocahontas stock. The sale of this stock resulted in taxable income to the petitioner. That he directed the disbursing agent to divert $33,544.21 from himself to the estate makes no difference here with respect to the question of who is taxable on the income. The test is not one of actual receipt. *Lucas* v. *Earl*, 281 U.S. 111 (1930) ; *United States* v. *Basye*, 410 U.S.

441 (1973). The petitioner sold the stock as its owner and is taxable on the proceeds. This is clear. However, part of the proceeds was diverted to pay valid debts of the estate of which the petitioner was the sole beneficiary following the settlement of the will contestants' suit.

Respondent has agreed that $27,500 of the $33,544.21 was paid to Harbaugh Miller for legal services. The balance ($6,044.21) was simply general estate debts, the recognition and payment of which would entitle the estate to a deduction. The estate could have liquidated certain assets to meet the need for cash. Petitioner wanted the estate to retain the assets, i.e., the Lear Siegler and the Second National Bank of Connellsville stocks. Since it would have been necessary to liquidate some of the stock to pay the remaining debts, the petitioner acted to make this unnecessary.

The $33,544.21 representing a portion of the proceeds of the United Pocahontas stock is properly treated as income to the petitioner. The $6,044.21 was expended on debts *not* those of the petitioner. Had he purchased property subject to a mortgage his cost basis would include the mortgage. This point made by the petitioner is correct. However, this is different from the situation posited by the petitioner and in fact present under these facts, namely, that if the petitioner paid a debt not his, then the payment would constitute an addition to his basis in the property. Payment of a debt that is not an obligation is not a deductible item; nor can it be treated as a capital charge. The respondent has conceded certain costs as proper additions to basis, but these were obligations of the estate paid by the estate. The situation here where the debts of the estate are paid by the beneficiary in order to relieve the estate of the obligation are not of that kind.

The estate could have liquidated sufficient assets to pay the debts. In fact the estate could have been compelled to do so absent the infusion of liquid assets from the petitioner. This contribution assured the petitioner that the specific assets he desired would be available for distribution to him.

The expenses paid by the estate that have been added proportionately to the basis of the three stocks differ in a material way from the $6,044.21 paid by the petitioner to the estate and then paid by the estate to creditors. The expenses added to the basis were paid by the estate while these expenses were paid by the petitioner in order to insure the delivery of the stock to him. This situation is similar to that in *Florence W. Hunt*, 35 B.T.A. 1042, 1052 (1937), and is in accord with section 1016(a)(1), Internal Revenue Code of 1954. Accordingly, we hold that the payment of $6,044.21 to the Pittsburgh National Bank is not a proper addition to the basis in the stocks the petitioner received from the estate.

E. *Mellon National Bank.*—Petitioner paid $250 to the Mellon National Bank on November 25, 1964, to compute the amount of interest, or surcharge, which may be owed by the Pittsburgh National Bank.

It is respondent's position that this expenditure does not meet the origin of the claim test with respect to the defense of petitioner's interest in the estate. See *United States* v. *Gilmore*, 372 U.S. 39 (1963) ; *Woodward* v. *Commissioner*, 397 U.S. 572 (1970) ; *United States* v. *Hilton Hotels*, 397 U.S. 580 (1970) ; *Vincent Boagni, Jr.*, 59 T.C. 708, 713 (1973). We agree with the respondent. The issue involved in that litigation was whether the Pittsburgh National Bank, as administrator of the Estate of Gertrude K. Lare, was negligent and should be surcharged for its failure to invest the cash of the estate. Although the action arose in the Estate of Gertrude K. Lare, no defense of the petitioner's heirship was involved since the claim of the will contestants had been settled in January 1964. Petitioner pressed the claim for the interest surcharge and obtained a new benefit for himself, i.e., a settlement of $90,000 on his claim.

Petitioner has not shown that the payment of the $250 to the Mellon National Bank had its origin in the defense of his interest in the stocks of the estate. In fact, the expenditure has a direct relationship to the petitioner's recovery of $90,000 in the interest surcharge litigation. Consequently, we conclude that it is not a proper addition to the basis of the stocks.

F. *Plowman & Spiegel.*—Petitioner claims that the amounts he paid to Jack W. Plowman should be treated as additions to the basis of the stocks. These amounts total $4,735.20. Respondent contends that these amounts do not constitute additions to the basis of the stocks because they were paid for matters other than the defense of petitioner's heirship to the estate.

We agree with the respondent. The amounts of $478.95 and $256.25 were paid to Jack Plowman, whose firm is Plowman & Spiegel, to defend against suits brought by Bresci R. P. Leonard and his law firm against the petitioner. These lawsuits were to recover legal fees allegedly owed by petitioner to Mr. Leonard. The amounts paid to Mr. Plowman to defend against the lawsuits by Mr. Leonard and his law firm do not meet the origin of the claim test. The legal fees were paid to Mr. Plowman to avoid paying additional legal fees to Mr. Leonard rather than expended in the defense of petitioner's heirship. Mr. Leonard was not trying to defeat petitioner's interest in the estate.

The remaining amounts ($4,000) were paid to Mr. Plowman to prosecute the interest surcharge action. These amounts likewise fail to meet the origin of the claim test. The objective of the litigation was not to defend petitioner's heirship in the estate, but to obtain a surcharge

against the Pittsburgh National Bank. See and compare *Robert V. Rafter*, 60 T.C. 1 (1973), affirmed without opinion 489 F. 2d 752 (C.A. 2, 1974).

We view the successful attempt to acquire a new benefit as not having its origin in the defense of petitioner's heirship. Moreover, it seems to us that the $4,000 paid to Mr. Plowman with respect to the interest surcharge claim is properly an offset or deduction against the $90,000 paid by the Pittsburgh National Bank to petitioner in the settlement of the claim.

Accordingly, we hold that neither the legal fees paid to Mr. Plowman for the defense of the Leonard lawsuits nor those paid to Mr. Plowman on the interest surcharge claim are proper additions to the United Pocahontas and the other two stocks.

G. *Murrelle Printing Co.*—Petitioner incurred substantial expenses in the original action with respect to the validity of Gertrude K. Lare's will. He has been allowed to capitalize the litigation expenses incurred in that action. The printing of the briefs and the record in a portion of this litigation was done by Murrelle Printing Co. during a summer season when a discount was offered. The discount allowed the petitioner was $134.82. Since the amount was not paid by the petitioner, it follows that it may not be added to the basis of the stocks ultimately received.

H. *Bloom & Bloom and Prothonotary fee.*—The expenditure of $250 to Mr. Bloom was made for his legal services in connection with an unsuccessful suit against the Pittsburgh National Bank. Petitioner filed a complaint in trespass in the Common Pleas Court of Allegheny County, Pa., which dismissed the case upon preliminary objections. Petitioner sought damages of $2,500,000 against the bank, alleging that it was improperly appointed administrator of the estate. The facts clearly show that the origin of the claim was not in defense of petitioner's interest in the stocks in the estate. He was seeking a new benefit of $2,500,000 from the bank. He was also making a collateral attack upon the administrator of the estate.

Petitioner paid $3 to the Prothonotary of the Supreme Court of Pennsylvania for filing fees on appeal. The appeal was later discontinued by petitioner. The fee was not sufficiently related to petitioner's heirship in the estate.

We conclude that the amounts paid to Mr. Bloom and to the Prothonotary are not proper additions to the basis of the stocks.

I. *Bugnone & Swope.*—The amounts of $24 and $16.20 were paid to Bugnone & Swope for copies of depositions in connection with the litigation by Bresci R. P. Leonard and his law firm against the petitioner. These expenditures do not meet the origin-of-the-claim test. They had nothing to do with defending petitioner's interest in the es-

tate. They were made as a result of a personal dispute between Mr. Leonard and the petitioner over the legal fees due Mr. Leonard.

The prior discussion of Mr. Plowman's fees to defend against Mr. Leonard's suits is applicable here because they were paid in connection with the same lawsuits. Therefore, we hold that such payments are not proper additions to the basis of the stocks.

To reflect the concessions of the parties and our conclusions on the disputed issues,

*Decision will be entered under Rule 155.*